**TRANSATLANTIC FINANCING CORPORATION**

v.

**The UNITED STATES of America.**

**No. 39–58.**

United States District Court
District of Columbia.

April 28, 1965.

Morton Liftin, Washington, D. C., for Transatlantic.

David C. Acheson, U. S. Atty. for the District of Columbia, and William E. Gwatkin, III, Dept. of Justice, Washington, D. C., for respondent.

MEMORANDUM OPINION

CORCORAN, District Judge.

This case involves a libel by Transatlantic Financing Corporation (herein Transatlantic) against the United States of America for abnormal costs incurred by the libellant in the ocean transporta-

tion of cargo for the United States Government from Galveston, Texas to Bandar Shapur, Iran. The added costs are attributable to a diversion of a ship from the normal sea route due to the blockage of the Suez Canal on July 26, 1956 by the Egyptian Government.

The Court has jurisdiction of the cause by reason of the Suits in Admiralty Act, 46 U.S.C. §§ 741–742.

The facts were stipulated and the case argued on briefs.

The controlling facts follow:

On October 2, 1956 the libellant and the United States (acting through the United States Department of Agriculture as agents for the International Cooperation Administration) executed a voyage charter for the carriage by the SS CHRISTOS (then under a time charter to Transatlantic) of a shipload of bagged wheat from a United States Gulf port to one or two safe ports in Iran, the port or ports to be designated by charterer.

The charter did not prescribe the sea route to be followed by the CHRISTOS but the normal, most direct route would have been via the Straits of Gibraltar and the Suez Canal. The freight charge was agreed at $31.00 per ton or $31.50 per ton if two ports of discharge were designated. Ninety percent of the freight was to be paid on completion of loading and the balance with all adjustment for dispatch, demurrage, dead freight and extra freight was to be paid after completion of the voyage, on vouchers supported by documents.

The CHRISTOS loaded a cargo of 9,982.5 long tons of bagged wheat at Galveston, Texas and cleared that port on October 27, 1956 for Bandar Shapur, Iran where the United States, exercising its option, had directed that the entire cargo was to be discharged.

The ship plotted a course through the Straits of Gibraltar and the Suez Canal. In the meantime, on July 26, 1956, the Government of Egypt had nationalized the Suez Canal Company and assumed its operation, causing an international crisis

which was unresolved at the time that the CHRISTOS cleared for Iran. However, on the date of sailing the Canal was still open to traffic notwithstanding the seizure by the Egyptian Government.

Two days after the CHRISTOS cleared Galveston, to wit on October 29, 1956, Israel invaded Egypt. On October 31, 1956 Great Britain and France invaded the Suez Canal Zone. On November 2, 1956 the Egyptian Government sank three ships to obstruct the entrance to the Canal and thus closed it to traffic. The CHRISTOS, in Mid-Atlantic, thereupon reduced her speed to await developments and instructions.

On or about November 7, 1956 a Mr. Beckman of J. H. Winchester and Company, the brokers and agents for the libellant, called a Mr. Potosky of the Transportation and Storage Division of the Department of Agriculture with whom the negotiations for the carriage charter had been conducted. Beckman, in view of the Suez crisis, requested instructions concerning the disposition of the cargo or the deviation of the ship from its normal course. He sought an agreement from Potosky to pay additional compensation to cover the cost of routing the ship around the Cape of Good Hope. Potosky was not the contracting officer for the Department of Agriculture and although he was authorized to engage in preliminary negotiations he had no authority to bind the United States to a contract or a modification of a contract. He advised Beckman that the United States expected Transatlantic to live up to the terms of the charter, i e., to deliver the cargo at the designated port in Iran regardless of the route required to be followed. He further advised Beckman that he did not believe Transatlantic was entitled to additional compensation for costs incurred by reason of a deviation, but that Transatlantic would be free to file a claim if in the opinion of Transatlantic it was entitled to additional compensation.

On the same day, November 7, 1956, the libellant advised the ship's master to proceed to Bandar Shapur via Cape

of Good Hope. The CHRISTOS there-upon changed course and began its voy-age around the Cape.

On November 14, 1956 Beckman again called Potosky to advise that the CHRIS-TOS had been reported off Dakar and was proceeding to Iran by way of the Cape. On this occasion Potosky, having by this time conferred with his superiors, advised Beckman that the United States Government would not amend the char-ter to provide for additional compensa-tion for the voyage around the Cape, but that Transatlantic was free to file a claim therefor.

The CHRISTOS continued its chosen course and arrived at Bandar Shapur December 30, 1956. She completed off-loading her entire cargo at that port on January 8, 1957. The voyage via the Cape had added an estimated 18 days to voyage time and approximately 3100 miles to ocean mileage over that which would have been required for a voyage via Suez.

The stipulated facts include figures covering steaming time, ocean mileage, bunkering and other cost factors. The libellant claims the added costs amount to $43,972 without allowance for over-head and profit.

In the meantime, on November 1, 1956 Transatlantic had submitted to Ag-riculture a voucher for $278,511.75, rep-resenting 90% of the freight payable on loading and showing a balance pay-able after discharge of cargo of $30,-945.75. By check dated November 5, 1956 the United States paid Transatlan-tic the $278,511.75. This demand and payment were in accord with the charter terms mentioned above.

On January 16, 1957, following the dis-charge of the cargo in Iran, Transatlantic requested a further payment to cover the balance of $30,945.75. In the course of processing this request the United States Government deducted the sum of $3,779.58, representing dispatch money for laytime saved in the loading and dis-charge of the cargo, and transmitted its check to Transatlantic in the sum of $27,-166.17. Transatlantic disputed the Gov-

ernment's calculations and claimed an additional $165.00. The Government, after consideration, transmitted its check in that amount to Transatlantic on April 7, 1957. This closed out any claim or dispute concerning the freight charges and libellant asserts no further liability on this score.

On December 26, 1958, however, Trans-atlantic had submitted a further claim to the Department of Agriculture in the amount of $41,175.83 as compensation for the estimated additional costs incur-red in the voyage around the Cape of Good Hope. The Government rejected the claim asserting that its only liability under the carriage charter was to pay for freight as specifically set forth in the charter, that it had not authorized or directed the deviation and that it as-sumed no liability in connection with it.

Transatlantic asserts its right to com-pensation on the theory that it was as-sumed and understood by the parties at the time of the negotiation and execu-tion of the charter that the CHRISTOS would follow the normal and shortest sea route to Iran by way of the Suez Canal; and that when that purpose was frustrated by events beyond the control of the libellant, and the Government nevertheless insisted upon delivery, there arose an obligation on the part of the Government to compensate Transatlan-tic, *quantum meruit,* for any expense in-curred by it in diverting the CHRISTOS from the usual route.

This case rests in one of the most troublesome fields of contract law—the law of impossibility of performance and particularly that area of impossibility dealing with frustration. Risks and un-certainties pertain to any contract and sometimes as here, supervening events, not attributable to the parties, are such as to render it impossible to attain the ultimate purposes of the contract (i. e., delivery in Iran) in strict accordance with its terms, express or implied (i. e., via Suez). The dilemma arises—can the contract be abandoned because its terms cannot be observed strictly or must the contract be carried out by other means

not expressed within it or contemplated by it to achieve the agreed purpose.

■ The Court concludes that the prevailing law is that if a supervening event, not attributable to a party, does in fact make it impossible to go forward, the contract may be abandoned without liability; but that if the supervening event only renders attainment of the ultimate objective more oppressive or more expensive, the contractor has the duty to go forward without extra compensation.

■ The Court places this case in the latter category and follows the rule expressed in Corbin on Contracts (§ 1333) to the effect that the risk of supervening difficulty and expense is for the contractor to bear. "He (the contractor) is not discharged from duty by actually unexpected difficulties or expense and he has no right to extra pay for completing the job." The Restatement of Contracts (Vol. II, § 467) is to the same effect. E. g., United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); Boyden v. United States, 80 U.S. (13 Wall.) 17, 20 L.Ed. 527 (1871); Foster v. Atlantic Refining Co., 329 F.2d 485 (5th Cir. 1964); Peerless Cas. Co. v. Weymouth Gardens, 215 F.2d 362 (1st Cir. 1954). The rule seems particularly apt in a case involving a voyage charter which concerns itself essentially with point to point carriage rather than with the designation of a particular route.

Of course, the general rule might not apply in the face of evidence of custom throwing the risk one way or the other or in the face of a mutual contemplation or understanding as to the impact of risk. But such latter factors are not present in this case. So far as the record indicates, the only person who had any conversations or communications with Transatlantic during the negotiations of the charter was Potosky and Potosky, it is admitted, was not a contracting officer and had no power to bind the Government to a contract or to an amendment of a contract. Further, even if Potosky were clothed with apparent authority, the record is bare of any indication that the parties contemplated or agreed that the CHRISTOS was to follow the route through the Canal and only that route. The charter, as noted, is silent on the subject and if we go outside the charter, the only evidence is that Potosky notified Transatlantic on at least two occasions that the charter would have to be strictly applied and could not be amended in any respect to permit Transatlantic to look to the Government for added compensation for the voyage around the Cape.

■ The mere fact that Potosky suggested that the Government might consider a further claim for compensation cannot be construed as an admission that the Government was liable for such compensation.

Thus the Court finds no basis for liability outside the charter, and the only liability under the charter was for the Government to compensate CHRISTOS for the freight in accordance with the charter terms. Transatlantic makes no claim with reference to such charges and it can only be concluded that it has accepted the monies tendered by the Government in full satisfaction of any liability in this regard.

It is accordingly the judgment of this Court that libellant has failed to state a cause of action upon which relief can be granted, and the libel is dismissed. Cf., Glidden v. Hellenic Lines, Ltd., 275 F.2d 253 (2nd Cir. 1960); Gans SS Line v. Wilhelmsen, 275 F. 254 (2nd Cir. 1921).

This Memorandum Opinion shall constitute the Court's findings of fact and conclusions of law.