◼ PARKSVILLE MOBILE MODULAR, INC., Respondent, v HERBERT S. FABRICANT et al., Appellants. (Action No. 1.) ESTATE OF ISIDORE GOODSTEIN, Respondent, v HERBERT S. FABRICANT et al., Appellants. (Action No. 2.)—In two actions to recover damages for legal malpractice, defendants appeal from two judgments (one in each action) of the Supreme Court, Orange County, each entered September 18, 1978, which, after a joint trial by jury, held defendants liable to the corporate plaintiff for $30,000, and to the estate of Isidore Goodstein for $90,000. Judgments reversed, on the law and the facts, and new trial granted in accordance with the views set forth herein, with costs to abide the event. Defendants' alleged malpractice arose out of their representation of plaintiffs in the case of *Rex-Noreco, Inc. v Goodstein & Parksville Mobile Modular.* Rex-Noreco, Inc., commenced that action in United States District Court for the Southern District of New York, to enforce a covenant not to compete in the sale of mobile homes. In 1970 Isidore Goodstein, than an employee of Rex-Noreco, signed a covenant that upon the termination of his employment "for any reason whatsoever" and for a period of two years thereafter, he would not compete with Rex-Noreco in the sale of mobile homes within a 200-mile radius of any of Rex-Noreco's sales lots. Early in 1974, Isidore Goodstein's employment was terminated, and he opened his own mobile home business in Parksville, New York, in the name of Parksville Mobile Modular, Inc., a close corporation formed by Isidore Goodstein. The Parksville lot was within seven miles from the so-called "Loch Sheldrake" mobile home sales lot, formerly owned by Lock Sheldrake Mobile Home Sales, Inc., a wholly owned subsidiary of Rex-Noreco, Inc. On April 18, 1974 Rex-Noreco commenced an action in United States District Court for the Southern District of New York against Parksville and Isidore Goodstein, individually, alleging breach of the covenant not to compete and demanding, *inter alia,* a preliminary injunction and a permanent injunction. Isidore Goodstein retained the defendant law firm of Fabricant, Lipman, Kennedy and Sweeney, Esqs., to represent him in that action on April 22. On April 24 Fabricant filed papers in opposition to the application for a preliminary injunction. In those papers, Fabricant

noted that the Loch Sheldrake sales lot had been sold to an independent dealer in March, 1973, and that Rex operated no other mobile home sales outlets in the State of New York or within 200 miles of Parksville. Fabricant also argued that the competitive restriction was unreasonable and unenforceable and that there are approximately 400 mobile home sales lots in the State of New York whose business operations cannot be characterized as unique. Rex-Noreco countered with additional affidavits, acknowledging that it had sold the Loch Sheldrake sales lot to an independent dealer, but claiming that that independent dealer still sold *used* mobile homes for Loch Sheldrake on a consignment basis. On April 30 Fabricant responded with additional papers, which noted that "The Loch Sheldrake contracts consist of no new homes and 21 repossessions varying in model year from 1964 to 1971, except for one 1972. Significantly not one such contract is of a 1973 model." Fabricant also submitted a memorandum of law, arguing that Goldstein's retail mobile home sales business did not compete with Loch Sheldrake, because Loch Sheldrake's sales were confined to used mobile homes. Further, Fabricant argued that "The sale of mobile homes by small family enterprises is common enough. There are more than four hundred (400) of them in New York State alone. Their operation involves neither esoteric knowledge nor trade secrets." On May 6, 1974 the District Court Judge to whom the case was assigned conducted a hearing on the question of whether "the Loch Sheldrake location is of such a nature as to qualify as a location referred to in the letter covenant not to compete". At that hearing Rex-Noreco's president testified that Loch Sheldrake sold both new and used mobile homes in 1970. However, he acknowledged that at the time of the hearing Loch Sheldrake sold only used mobile homes. As its second witness, Rex-Noreco wanted to call Isidore Goodstein to the stand, allegedly to establish that Goodstein negotiated with Rex-Noreco's bank for credit for his own business while he was still employed by Rex-Noreco, but the Judge stated: "Let me state that if I thought the determination here depended on the equities of the situation, I would think it quite appropriate for you to ask these questions. But I really don't. I think that I have very much a straight contract question here and I am prepared to rule at the present time." The Judge then held "that the operation being conducted by Loch Sheldrake at the Loch Sheldrake location is at least substantially similar today to what it was at the time that the letter agreement of August 14, 1970 was entered into" and issued a preliminary injunction. That order was affirmed by the United States Court of Appeals for the Second Circuit. There is some dispute as to what happened at that juncture. Fabricant claims that Isidore Goodstein came to his office one day with a friend, Adam Filipowski, and suggested the possibility of a sale of Parksville Mobile Modular, Inc., to Filipowski. Fabricant claims that he was very "leery" of such an arrangement and advised Goodstein that any sale must be entered into with full disclosure of the injunction; he contends that it was entirely Goodstein's decision to sell. According to Isidore Goodstein's wife, Constance, and his son David, Fabricant suggested that they try to "get around" the injunction, and offered to buy the corporation himself as a "front". Isidore Goodstein claimed that Fabricant offered to purchase the corporation for $12,000 or $13,000. However, the Goodsteins decided to sell the corporation to their family friend, Adam Filipowski. Fabricant and Isidore Goodstein decided to structure the sale as a stock sale rather than an asset sale because the "floor plan", i.e., the arrangement with Kingston Trust Company to provide customers with financing when they purchased mobile homes, was in the name of the corporation. Fabricant drew up a stock sale

agreement, wherein Filipowski agreed to substitute himself for Isidore Goodstein as a personal guarantor of Parksville's obligations and Goodstein agreed to pay all costs in connection with the action pending in the United States District Court, to hold Parksville harmless for any monetary damages assessed against it and to "defend such law suit in the name of Parksville". Pursuant to that agreement, Mr. and Mrs. Goodstein were to execute written resignations and Isidore Goodstein was to indorse the stock certificate, those documents to be held by Fabricant in escrow until he received written evidence that Kingston Trust Company had accepted Filipowski as guarantor of Parksville's obligations in place of Goodstein. Filipowski also agreed to employ the same employees, one of whom was Isidore Goodstein's son David. Filipowski showed the agreement to his brother, who was an attorney. On July 30, 1974 Mr. and Mrs. Goodstein and Filipowski met in Fabricant's office to execute the agreement. Before executing the agreement, Filipowski made some minor changes and added a provision that David Goodstein was to be paid $200 per week. Mrs. Goodstein and Filipowski claim that Fabricant told Filipowski to sign the back of the stock certificate in blank so the Goodsteins could get the business back when the "court action was over", but Fabricant categorically denies that. Thereafter, Filipowski was accepted by the Kingston Trust Company as personal guarantor of Parksville's liabilities. However, Goodstein remained personally liable on some of the obligations incurred in connection with the business. Nonetheless, Goodstein telephoned Fabricant, told him that Filipowski had been substituted as guarantor, and asked Fabricant to release the documents held in escrow. Fabricant called the bank, which verified that Filipowski had been accepted as personal guarantor. Without receiving written verification that such was the case, Fabricant released the documents to Filipowski. In mid-August, Rex-Noreco served an order to show cause on Goodstein, seeking to hold Parksville and Goodstein, individually, in contempt for violating the preliminary injunction. Defendant Sweeney claims that he advised Goodstein that Parksville had to find separate counsel immediately. However, Goodstein could not get in touch with Filipowski because Filipowski was on vacation. On August 28, 1974, the District Court Judge conducted a hearing on the *bona fides* of the sale, and later concluded that Rex-Noreco "established a *prima facie* case that the transfer of the stock and management of Parksville from Isidore Goodstein to Adam Filipowski was not bona fide", based upon the fact that Filipowski took no active part in the management of the business, rarely appeared on the premises, and was not engaged in the business of selling mobile homes before his alleged takeover, and the fact that Filipowski retained the same employees, including David Goodstein, who earned $200 per week, $100 of which he contributed to the support of his father's family. However, the Judge reserved decision, pending receipt of memoranda of law and more information with respect to Fabricant's role as the escrow agent. In the meantime, Fabricant sent Filipowski a letter on September 16, 1974, advising Filipowski to retain his own attorney. Filipowski admits that he received this letter but claims that Sweeney never made it clear to him that it was incumbent upon him to retain another attorney. Nonetheless, upon receipt of that letter, Filipowski did contact an attorney. On September 30, 1974, this attorney conferred with Sweeney and told Sweeney he was "reluctant to get involved". This attorney agreed to represent Filipowski at a deposition scheduled for the following day, and said he "would then consider whether or not he would carry on further with Parksville's representation", but he did not communicate further with Sweeney. Sweeney submitted additional affidavits stating

that Filipowski had indeed been substituted as personal guarantor of the corporate debt. However, on November 7, 1974, the Judge adjudicated Parksville in contempt. In his memorandum decision, the Judge noted that Parksville had failed to retain its own counsel, and therefore was technically in default. Nonetheless, he went on to decide the case on the merits. The Judge took into consideration the fact that Fabricant, acting as escrow agent, released the corporate documents to Filipowski without receiving written notification from the Kingston Trust Company that Filipowski had been substituted as personal guarantor of the corporate debts. The Judge also noted that Goodstein remained personally liable for certain obligations which he incurred in connection with the business, e.g., payments on a truck. However, the Judge also relied upon other factors, e.g., that Parksville had not changed its operating procedures since the transfer, that David Goodstein was still employed by Parksville at a salary of $200 per week, that David contributed $100 per week to the support of his father's family, and that Filipowski took no active part in the management of the business. The Judge awarded Rex-Noreco $2,070.30 and ordered Parksville to close down. In December, 1974 both Goodstein and Parksville retained new attorneys. Parksville's attorney discovered that no answer to Rex-Noreco's complaint had ever been filed. However, both Parksville and Goodstein were allowed to file late answers and the parties proceeded to trial on January 20, 1975. The trial lasted approximately two weeks. In April, 1975 the Judge rendered his verdict, and permanently vacated the preliminary injunction on the merits, relying upon evidence adduced at trial that (1) Loch Sheldrake sold only used mobile homes while Goodstein and Parksville sold new mobile homes and (2) there were approximately 10 retail mobile home dealers within a 10-mile radius of plaintiff's Loch Sheldrake location and close to 50 dealers within a radius of 25 miles. However, the Judge did award Rex-Noreco $3,816.02 in damages for, *inter alia*, severance payments paid by Rex-Noreco to Goodstein upon termination of his employment. This action for legal malpractice was presented to the jury primarily on the theory that counsel were responsible for issuance of the preliminary injunction. Plaintiffs contend that defendants are liable because they failed to bring to the Judge's attention the fact that Loch Sheldrake sold only used mobile homes while Goodstein and Parksville sold only new mobile homes, as well as the fact that there were approximately 10 retail mobile home dealers within a 10-mile radius of Rex-Noreco's Loch Sheldrake location and close to 50 dealers within a radius of 25 miles. The Federal Judge had relied upon these facts, which were adduced at the trial, when he vacated the preliminary injunction. However, the documentary evidence establishes conclusively that defendants vigorously opposed the application for the preliminary injunction and presented several arguments against granting such relief, including the argument that Loch Sheldrake was not in competition with Goodstein because it sold only used mobile homes. Admittedly, counsel did not note that there were 10 retail mobile home dealers in a 10-mile radius of the Loch Sheldrake location. An attorney has the responsibility to "investigate and prepare every phase" of his client's case (see *Giaramita v Flow Master Mach. Corp.,* 234 NYS2d 817, 818). However, there is also authority to the effect that an attorney should not be held liable for his ignorance of facts which his client neglected to tell him (see *Rapuzzi v Stetson,* 160 App Div 150). The issue is reasonableness. The Federal litigation had only been in progress for two and one-half weeks when the Judge decided to issue a preliminary injunction. The fact that counsel did not develop as full a record as was ultimately developed after a two-week trial

cannot be considered legal malpractice. We find, as a matter of law, that defendants exercised reasonable care in opposing Rex-Noreco's application for a preliminary injunction. In an action for legal malpractice, plaintiff must not only prove lack of reasonable care; plaintiff must also establish that he would have been successful in the underlying action, if his attorney had exercised due care (see *Kerson Co. v Shayne, Dachs, Weiss, Kolbrenner, Levy & Levine,* 45 NY2d 730; *Garguilo v Schunk,* 58 AD2d 683). At trial, plaintiffs alleged numerous instances of lack of due care on the part of defendants, but failed to present any evidence that but for these alleged omissions, they would have fared better in the underlying action. For example, Mrs. Goodstein and David Goodstein both testified that Sweeney performed poorly at the oral argument of the appeal from the order granting a preliminary injunction. These witnesses claimed that Sweeney was ignorant of the fact that Parksville sold new mobile homes while Loch Sheldrake sold only used mobile homes, so David passed him a note during oral argument, whereupon Sweeney explained that distinction to the court. However, one cannot infer that this incident affected the outcome of the appeal. Further, Mrs. Goodstein testified that Sweeney was late for a deposition, and left her and her husband waiting for two hours on Madison Avenue. Plaintiffs' expert later testified that an attorney is obligated to confer with his client before an examination before trial. However, there was no evidence that damages flowed from defendants' alleged failure to prepare their witnesses for examinations before trial. Indeed, plaintiffs were ultimately successful at the Federal trial. Plaintiffs also contended at trial herein that defendants should have moved to dismiss the action in United States District Court, based upon a clause in the covenant not to compete that "The parties consent to the jurisdiction of the courts of the State of New Jersey". But this clause was not a stipulation that the New Jersey State courts were to have exclusive jurisdiction over the dispute; it was merely an agreement that a suit could be brought in New Jersey. Significantly, this issue was ultimately raised in the answers filed by Goodstein and Parksville in December, 1974, yet the action was not dismissed. In any event, there was no proof of damages, i.e., that plaintiffs would have fared better had the action in Federal court been dismissed and recommenced in New Jersey. We further note that the trial court's instruction to the jury that "the Federal Court could have declined to exercise its jurisdiction if it had been asked to and thereby [give] effect to the parties' stipulation" was erroneous. Moreover, plaintiffs made much of the fact that defendants never filed an answer in the Federal action, forcing new counsel to move to file late answers in December, 1974. Goodstein and Parksville were not held in default and were ultimately given permission to file late answers. Goodstein and Parksville argue that counsel's failure to file an answer delayed the trial on the merits. However, Rex-Noreco was still conducting pretrial discovery in October, 1974 and in December, 1974, plaintiffs changed their attorneys. Therefore, it cannot be said that the failure to file a timely answer significantly delayed the trial. Defendants did request jury instructions that they could not be held liable for their failure to file an answer, but that request was denied. After the stock sale, defendants should have withdrawn as attorneys for Parksville, but did not do so. Be that as it may, there was again no evidence of damage. In his order of November 7, 1974, the Federal Judge did find Parksville in default. If defendants had formally withdrawn as counsel for Parksville, Parksville would still have been in default, because Filipowski did not retain a separate attorney after he was directed to do so. In any event, the Judge went on to decide the merits and

based his determination upon a finding of fact that the sale was not bona fide. Therefore, the "default" was of no consequence. The only actionable claim raised by plaintiffs involves the stock sale itself. Once the preliminary injunction issued, Goodstein and Parksville were faced with a serious dilemma; any course of action would have had serious pitfalls. It is well settled that an attorney may take chances, and "If in such cases a lawyer errs on a question not elementary or conclusively settled by authority, that error is one of judgment for which he is not liable" *(Byrnes v Palmer,* 18 App Div 1, 4, affd 160 NY 699). And in view of the difficulty that his clients found themselves in, Fabricant was well justified in taking risks. What exactly happened at this juncture is very much in dispute. Mrs. Goodstein testified that Fabricant suggested that they try to "get around" the injunction, and offered to buy the corporation himself as a "front". Isidore Goodstein claimed that Fabricant offered to purchase the corporation for $12,000 or $13,000, but the Goodsteins decided to sell to Filipowski for $5,000, and then for nothing when Fabricant said monetary consideration was not necessary. Fabricant, on the other hand, claims that Isidore Goodstein and Filipowski came to his office one day and suggested the possibility of a sale. Fabricant claims that he was very "leery" of such an arrangement and advised Goodstein that any sale must be done with full disclosure of the injunction. Fabricant contends that it was entirely Goodstein's decision to sell. Then Fabricant drew up the stock sale agreement. Fabricant had the obligation to inform his clients of the possible pitfalls, or at least to refrain from affirmative statements that one could get around the injunction by finding someone to front for the corporation. Although one may entertain serious doubts as to the credibility of the Goodsteins' version, plaintiffs *made out a prima facie case. If defendants did indeed recommend a nonbona fide sale,* defendants would be liable to plaintiffs for the damages flowing therefrom. However, a verdict on that theory would have been against the weight of the evidence. Further, defendants' handling of the mechanics of the sale left something to be desired. Fabricant, acting as escrow agent, released the corporate documents to Filipowski without receiving written notification from Kingston Trust Company that Filipowski had been substituted as personal guarantor of the corporate debts. The Federal Judge took this into consideration when he determined that the sale was not bona fide and held Parksville in contempt, but he also relied upon other factors, i.e., (1) that Parksville had not changed its operating procedures since the transfer; (2) that David Goodstein was still employed by Parksville at a salary of $200 per week, and contributed $100 per week to the support of his father's family; and (3) that Filipowski took no active part in the management or operation of the business, rarely appeared on the premises, and was not engaged in the business of selling mobile homes prior to the sale. A conclusion that Fabricant's omission caused the contempt order to issue would also have been against the weight of the evidence, and therefore there should be a new trial on that point as well. (See *Martin v City of Albany,* 42 NY2d 13.) At the new trial, plaintiffs should limit their proof to those issues on which they can make out a prima facie case, i.e., the adequacy of defendants' advice with respect to the pitfalls of a stock sale, and defendants' handling of the mechanics of that sale. O'Connor, J. P., Rabin, Gulotta and Margett, JJ., concur.