Seymour M. CHASE, Appellant,

v.

Milton A. GILBERT, et al., Appellees.

Milton A. GILBERT, et al., Appellants,

v.

Seymour M. CHASE, Appellee.

GILBERT BROADCASTING
CORP., Appellant,

v.

Seymour M. CHASE, et al., Appellees.

Nos. 83–425, 83–489 and 83–490.

District of Columbia Court of Appeals.
Argued March 12, 1985.
Decided Nov. 4, 1985.

Charles T. Duncan, Washington, D.C., for appellant.

Michael L. Denger, and David P. Durbin, Washington, D.C., with whom Edward J. Lopata, Washington, D.C., was on the brief, for appellees.

Before FERREN and ROGERS, Associate Judges, and PAIR, Senior Judge.

ROGERS, Associate Judge:

Appellant Seymour M. Chase appeals a judgment awarding him compensation for legal services rendered to Gilbert Broadcasting Corporation in connection with its application to the Federal Communications Commission for a radio license. Mr. Chase alleged that the corporation and its individual officers and directors are jointly and severally liable for delinquent attorney's fees of $187,004.27 pursuant to a fee agreement of July 1, 1975, as modified by a series of later agreements. The trial court found that the parties had agreed to an October 6, 1975, fee arrangement which covered the disputed claim of Mr. Chase for additional compensation in connection with the so-called ministers' issue, and that he was not entitled to recovery on the theory of *quantum meruit*. Since the October 6, 1975, agreement provided that Mr. Chase was to receive $60,000 plus disbursements, the trial court found that he was entitled to receive $70,484.88 and had received $67,889.14, and, therefore, entered judgment for $2,595.74. The court also dismissed cross-appellant's counterclaim for legal malpractice against Mr. Chase.[1]

On appeal, Mr. Chase assigns as error the trial court's rulings that: (1) he was not entitled to recover *in quantum meruit* for the reasonable value of services rendered to the corporation; (2) he presented insufficient evidence to pierce the corporate veil and render Mr. Gilbert, the president and

---

1. By stipulation of counsel, Mr. Chase dismissed the claims against all of the individual defendants except Milton A. Gilbert. After a bench trial, the court dismissed the complaint against Mr. Gilbert individually, and entered judgment for Mr. Chase against the corporation for legal services. Mr. Gilbert filed a protective cross-appeal on the grounds of lack of personal jurisdiction in the event that we did not affirm on the merits. In view of our disposition, we do not reach the issue of lack of personal jurisdiction.

major stockholder of the corporation, personally liable for either the reasonable value of services relating to the ministers' issue or all services rendered from June 1975 to June 1978; and (3) he was not entitled to recover *in quantum meruit* for services rendered to Mr. Gilbert. Upon review of the record we find no reversible error; accordingly, we affirm.

## I

The dispute about Seymour M. Chase's (Chase) legal fees concerns the period July 1, 1975 to July 10, 1978. During that time, while Gilbert Broadcasting Corporation (GBC) was waiting for the Federal Communications Commission (FCC) to decide on its application to operate radio station WNJR, an issue arose concerning the illegal use of WNJR to broadcast lottery numbers. Chase had filed the FCC application on behalf of GBC. In March 1967, two principals of GBC advised Chase that ministers were broadcasting lottery information on WNJR while it was being operated on an interim basis by a partnership, including GBC, which was also seeking a license to operate the radio station. After reviewing tapes of the programs, Chase concluded that the ministers' broadcasts involved a serious violation of established FCC policy and, therefore, provided a substantial basis for disqualifying GBC's competitors for the radio station license. He recommended that GBC not act until the FCC issued its initial decision on GBC's application; if it was approved, then the ministers' issue could be used to try to persuade the competitors not to appeal, but if the decision was against GBC, then the information could be used in a petition to reopen the proceedings. GBC adopted his recommendation.

Chase relies on the ten "fee letters" to support his claims that the written fee agreement prepared before he learned of the ministers' issue was not intended to include work on that issue, that GBC is bound by the terms set forth in the letters which he wrote after learning about the ministers' issue because GBC never expressed any disagreement with those terms and continued to authorize and accept his services in relation to the ministers' issue, and that five of the "fee letters" reflected oral agreements that had been reached between the parties. The trial court ruled that Chase's services relating to the ministers' issue were within the terms of his October 6, 1975, agreement in which he agreed "further to prosecute the applications for license until there was ... a final disposition of the matter by the Federal Communications Commission."

## II

Where the trial court sits without a jury, this court may reverse only for errors of law or if the decision is clearly wrong or without evidence of support in the record. D.C. Code § 17–305(a) (1981); *Nelson-Bey v. Robinson*, 408 A.2d 999, 1001–02 (D.C. 1979) (citations omitted); *Johnson v. Lloyd*, 211 A.2d 764, 765 (D.C.1965); *see also Banze v. American International Exports, Inc.*, 454 A.2d 816, 817–18 (D.C. 1983). The trial court properly admitted parole evidence to determine the meaning of the October 6, 1975 agreement since the phrase "further to prosecute [GBC's] applications for license until there is a final disposition" is open to more than one reasonable interpretation. *1901 Wyoming Avenue Corporative Association v. Lee*, 345 A.2d 456, 461 (D.C.1975); *Rich v. Sills*, 130 A.2d 920, 922 (D.C.1957); *see Roberts v. Veterans Cooperative Housing Association*, 88 A.2d 324, 326 (D.C.1952). We hold that the testimony of Mr. Gilbert and Mr. Green, both GBC principals, as well as the course of dealings between Mr. Chase and GBC and its principals, and Chase's expertise, provide ample support for the trial court's ruling that the parties are bound by the October 6, 1975 agreement and that Mr. Chase cannot recover *in quantum meruit*. *Leba v. Sills*, 175 A.2d 599, 600 (1961) (no recovery under *quantum meruit* when rights of parties and basis of compensation determined by special contract).

### A.

Chase contends that the ministers' issue was not within the scope of the October 6, 1975 agreement. He argues that the parties were fully aware of the scope of the fee arrangement when it was partially executed in October 1975, that, as an experienced FCC practitioner, he knew what generally was involved in the prosecution of a license application, and that neither he nor the principals contemplated or could have contemplated that an issue such as the ministers' issue would arise. Although there were apparently a number of discussions regarding fees,[2] there was no evidence, other than Chase's testimony, that there was ever any agreement to pay fees in addition to those in the October 6, 1975 letter. As an experienced attorney, Chase was familiar with the complexity of FCC proceedings, and had, in fact, been counsel in an FCC case which involved similar facts to the ministers' issue. He had the responsibility to draft his fee contract to make clear what services would be covered by it and what services would be excluded, *Roberts v. Veterans Cooperative Housing Association, supra*, 88 A.2d at 327 and could easily have included a provision in the October 6, 1975 letter to cover unanticipated work.

■ Chase's reliance on his nine letters is to no avail.[3] The language of the Au-

2. Before the three year period at issue, Mr. Gilbert had expressed his concerns about Chase's fees. Prior to July 1, 1975, GBC had been billed for $111,098 in legal fees by a law firm with which Mr. Chase was associated from July 1, 1972 to June 24, 1975. From June 1971 to July 1972 Chase had billed GBC for $40,062.17. In 1972 Mr. Gilbert had asked Chase to consider a fee arrangement which was partially contingent on grant of the license to GBC. Chase rejected the idea at that time. In May and June 1975 Mr. Gilbert asked the law firm with which Chase was associated to specify a ceiling on additional legal fees. For all of Chase's services, GBC claimed that it had paid $189,701.73 and that it had also incurred "substantial additional expenses for other matters relating to the [FCC] license application."

3. In the first letter dated July 1, 1975 to Mr. Gilbert, Chase purported to memorialize their agreement about his legal fees. He would charge $70 an hour for his services and "the fees for all services required for the trial of the case under the present issues, and until there is a final disposition of the case by the Federal Communications Commission, [would] not exceed $80,000." Mr. Gilbert would be personally liable for legal expenses incurred on behalf of the GBC if the corporation could not pay, would send $13,000 as an advance and a credit on GBC's account, and in August 1975, would begin making fee payments of $4,000 monthly and paying for disbursements. Mr. Gilbert did not sign and return the letter as requested, but sent the $13,000 advance.

The second letter, dated August 26, 1975, to Mr. Gilbert, followed a meeting in which Mr. Gilbert expressed his continued concern about the high amount of the legal fees. The August 26 letter proposed that Chase would continue to represent GBC in prosecuting its application until "a final disposition of the matter" for $3,000 per month for 20 consecutive months beginning September 1975 and at $70 per hour for prior work. Upon grant of the FCC license, he would also receive $25,000 and be retained as Washington counsel for the radio station. Additional charges at the regular hourly rate would be charged if GBC required his services "for other purposes, e.g., for an appeal of the Commission's decision to the courts, for the preparation and maintenance of the minutes and other records of the corporation, or for matters regarding the interim operation of WNJR." Mr. Gilbert personally would be responsible for any payments not made by the corporation, and requested that Gilbert sign and return the letter. Mr. Gilbert did not sign and return the letter; Mr. Chase, however, received $3,000 from GBC in September 1975.

The third letter, dated October 6, 1975, to Mr. Gilbert and the five other principals of GBC, proposed that each stockholder of GBC personally would be liable to the extent of his or her proportionate interest in GBC for any payments due by the corporation. With respect to Chase serving as counsel after the grant of the license to GBC, GBC could discharge him at any time without further obligation for the monthly fee. The letter was otherwise the same as the August 26 letter. All of the principals except Mr. Gilbert and Mrs. Stalks signed and returned copies of the letter to Mr. Chase; the letter had requested that Mr. Gilbert sign once on behalf of himself as well as President of GBC. Subsequent to this letter, from November 5, 1975 through April 1, 1976, GBC made six $3,000 payments.

A fourth letter dated July 6, 1976, followed the FCC's initial decision of June 25, 1976, awarding the license to Sound Radio, Inc. and rating Community Group for North Jersey Radio, Inc. second, and GBC, third. Chase confirmed the principals' agreement at a July 1, 1976 meeting regarding further FCC proceed-

gust 26, 1975 and October 6, 1975 letters belie his claim that the terms of the July 1, 1975 letter, except as modified, were intended to be carried forward. The August 26, 1975 letter proposed a totally new agreement, using the language "in lieu of the terms in my letter of July 1, 1975" and including a new $25,000 fee which Chase would receive when GBC's license application was approved by the FCC. By its terms, and as restated in the October 6, 1975 letter, the August 26 letter made clear Chase's intention to require additional fees for "other purposes," which he defined in terms of matters either following a final FCC disposition or unrelated to those proceedings. The July 1, 1975 language about "present issues" was dropped from all subsequent letters. Chase's letters after October 6, 1975 suggest that he understood he was bound by the October 6, 1975 fee arrangement; some of those letters stated that the parties had not agreed to other fee proposals. These circumstances provide support for the trial court's finding that the ministers' issue was within the scope of the October 6, 1975 agreement to prosecute

GBC's application "until there [was] a final disposition of the matter by the Federal Communications Commission."

■ We also find without merit Chase's contention that he is entitled to recover *in quantum meruit* even if the ministers' issue was within the scope of the October 6, 1975 contract. "[T]he right to recover in *quantum meruit* does not grow out of the contract, but it is independent of it. This right is based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted." *Campbell v. Northwestern National Life Insurance Co.*, 573 S.W.2d 496, 498 (Tex.1978) (citing 1 WILLISTON ON CONTRACTS § 3A (other citations omitted)). Thus a party who has incurred a detriment at the request of another, by rendering service to the other with the reasonable expectation of compensation, is as entitled to enforce his claim at law as one who has acted similarly based on an expressed promise. *Welsh v. Woods*, 47 Hawaii 252, 254, 386 P.2d 886, 887 (1963) (citations omitted). For reasons previously discussed, we hold that the record supports

ings. He also wrote, without requesting their acknowledgment, that:

> You also understand that the services required of me in the ministers' matter fall outside the current agreement which obligates me to handle, for a specified fee, appeals from the Initial Decision to the Review Board and to the Commission. These two appeals will almost certainly be necessary at a later date, and I will then conduct them without any additional fee.... I will perform all the services required in the ministers' matter at a 20% reduction from my current hourly rate. Thus, the rate will be $60 per hour.

The fifth letter dated December 16, 1976, followed the FCC's Review Board's decision on December 3, 1976, to remand and enlarge the issues to include GBC's competitors' qualification, in view of the ministers' broadcasts, and a determination of whether the knowledge of Mr. Amis, a GBC principal, of illegal broadcasts would adversely affect GBC's qualification for a license. Chase advised the principals that for a fee of $30,000, he would represent GBC on all issues specified by the Review Board until a supplemental decision was issued by the Administrative Law Judge. He noted that GBC owed him $35,019.21 in outstanding fees and disbursements, and instructed that his fees be paid at the rate of $1,200 a month beginning in

February 1977. He requested the principals to sign and return a copy of the letter to indicate their agreement; none did.

In the sixth letter dated January 11, 1977 to Mr. Gilbert, Chase indicated that although no one had signed the December 16, 1976, letter, he was continuing to act in order to preserve GBC's application. With a seventh letter of April 1, 1977, Chase enclosed another bill rendered at the December 16, 1976 rates and stated that if the December 16 agreement was not signed and returned by April 12, he would charge at his regular hourly rate; it acknowledged that the principals had, by failing to sign and return the December 16 letter, declined to be bound by it. An eighth letter, dated May 17, 1977, informed the principals that beginning June 1, 1977, Chase would begin charging one and one half percent per month as a carrying charge on their account. The ninth letter, dated June 17, 1978, stated that unless the principals signed promissory notes (totalling $160,000) for his outstanding bills and paid the first $3,000 monthly payment by June 27, Chase would withdraw as counsel for GBC, recommend that GBC retain other counsel, and take necessary steps to collect what was owed; the letter concluded by noting that there were good arguments which gave GBC a reasonable chance ultimately to prevail.

the trial court finding that the parties' actions in directing Chase to prosecute the application by reopening the proceedings before the Review Board, did not constitute an implied promise to pay him an additional fee beyond that agreed to in the October 1975 agreement. The cases on which Chase relies are readily distinguishable.[4] Chase cannot resort to *quantum meruit* merely because prosecuting the FCC application became more expensive than he had envisioned. Under the terms of a contract which he drafted he had "a duty to go forward without extra compensation." *Transatlantic Financing Corporation v. United States*, 259 F.Supp. 725, 728 (D.D. C.1965).

### B.

■ Chase also contends that the conduct of the parties demonstrates either that there was no meeting of the minds with respect to any particular fee proposal and he is therefore entitled to recover *in quantum meruit*, or that GBC, by making payments pursuant to his fee proposals, as-

sented to and is bound by each of those proposals. However, the record reveals that there was a meeting of the minds with respect to the October 1975 agreement and that it is a valid agreement. *Robert v. Veterans Cooperative Housing Association, supra*, 88 A.2d at 325–26 ("An agreement ... is nothing more than a manifestation of mutual assent."). All of the principals except two[5] signed and returned the October 6, 1975 agreement to Chase, and GBC made at least eight payments pursuant to that agreement. Although direct evidence is unnecessary to establish an express contract, Chase has not carried his burden to show that appellees' acts and conduct were sufficient to establish an express contract. *Richardson v. J.C. Flood Co.*, 190 A.2d 259, 261 (D.C.1963); *Roebling v. Dillon*, 109 U.S.App.D.C. 402, 404, 288 F.2d 386, 388 (citation omitted), *cert. denied*, 366 U.S. 918, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961). Nothing in the record reveals a manifestation of mutual assent by the GBC principals with respect to his fee proposals after October 6, 1975, or that his fee payments were made pursuant to

**4.** *Warner Corporation v. Magazine Realty Co.*, 255 A.2d 479, 480 (D.C.1968) and *Dodge's Market, Inc. v. Turner*, 67 A.2d 526, 528 (D.C.1959), stands for the fundamental rule that unless circumstances indicate otherwise, one who orders work done impliedly promises to pay for it, but here the circumstances indicate "otherwise" since the parties were operating under an express agreement by which they are bound. In *Geier v. Laughlin*, 129 A.2d 401, 402 (D.C.1957), the court held that appellant impliedly agreed to pay a reasonable compensation because, although there was no evidence of any express agreement, appellant was aware on the day of trial that she had been named as a co-respondent and accepted appellee's representation without protest or denial. In the instant case, there is no such clear evidence that GBC accepted the proposals to increase the amount of his fee; none of the principals signed and returned any of the fee proposals except the October 6, 1975 agreement, which was signed and returned by four principals. Even assuming Chase accurately memorialized his discussions with the parties on July 1, 1976, and several other occasions—that the ministers' issue was outside the scope of the October 6, 1975 agreement—there is no basis on which to conclude, in view of Chase's expertise as an attorney, his awareness of GBC's concerns about the high amount of

legal fees, *see supra* note 2, and his prior difficulty in receiving payment, that the trial court was clearly erroneous in rejecting Chase's proof of a vague oral agreement. *See Roberts v. Veterans Cooperative Housing Association, supra*, 88 A.2d at 327. Further, unlike the circumstances in *Roberts v. Veterans Cooperative Housing Association, supra*, Chase wrote in the October 6, 1975 agreement that he would prosecute GBC's application until there was a final disposition of the matter by the FCC; there were no reservations or provision comparable to that in his July 1, 1975 letter. Further, since we hold that the trial court did not err in interpreting the ambit of the October 1975 agreement, Chase's reliance on *Saul v. Blumenfeld*, 445 A.2d 613, 614–15 (D.C.1982), as determinative of the issue of *quantum meruit*, is misplaced.

**5.** That two principals did not sign and return the October 1975 agreement does not negate a binding contract between Chase and GBC. One who is not a party to a contract, but is an intended beneficiary, may have rights under the contract. *Bay General Industries, Inc. v. Johnson*, 418 A.2d 1050, 1055 (D.C.1980) (citing *Western Union Telegraph Co. v. Massman Constr. Co.*, 402 A.2d 1275, 1277 (D.C.1972)); *see Moran v. Audette*, 217 A.2d 653, 654 (D.C.1966).

any agreement other than that of October 6, 1975.

■ Furthermore, District of Columbia courts will scrutinize closely an attorney-client contract which is beneficial to the attorney and executed long after the attorney-client relationship has commenced. *Saul v. Blumenfeld, supra,* 445 A.2d at 614; *Pete v. United Mine Workers of America,* 171 U.S.App.D.C. 1, 17, 517 F.2d 1275, 1291 (1975) (quoting *Spilker v. Hankin,* 88 U.S.App.D.C. 206, 210, 188 F.2d 35, 39 (1951)). Viewing such modifications to be presumptively invalid, the courts place the burden on the attorney to demonstrate the fairness of the contract. *Pete v. United Mine Workers of America, supra,* cited in *Saul v. Blumenfeld, supra.* Chase's fee modifications were proposed at crucial stages of the FCC proceedings, when Chase had significant bargaining power. Having already obligated himself to prosecute GBC's application through the complete FCC proceeding, he attempted to procure an obligation by GBC to pay him an increased fee. Assuming substantial work was involved in addressing the ministers' issue, he was nevertheless bound by the October 6, 1975 agreement to do what was required. *Transatlantic Financing Corporation, supra,* 259 F.Supp. at 728.[6]

### C.

■ Chase contends for the first time on appeal that even if the ministers' issue is deemed within the scope of the October 6, 1975 agreement, he is entitled to recover *in*

*quantum meruit* because he was discharged prior to the expiration of the term of the contract and, hence, may recover for services actually rendered, without regard to the specified contract price. Although in exceptional cases where injustice might result, an appellate court may review questions not raised at trial, *Wagshal v. District of Columbia,* 430 A.2d 524, 527 (D.C. 1981); *Bullock v. Young, supra,* 118 A.2d at 919, this exception was not created to undermine the underlying policy that trial consideration must precede appellate consideration in order to prevent piecemeal litigation. *Miller v. Avirom,* 127 U.S.App. D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967); *Bullock v. Young, supra,* 118 A.2d at 919.[7] The rule disallowing new issues to be raised on appeal is especially appropriate where appellant is an attorney who is held to know the rules of procedure and appellee claims prejudice. The trial court did not address the circumstances under which the relationship between Chase and GBC was severed. Moreover, as the parties acknowledge, the issue of whether an attorney can recover *in quantum meruit* for the reasonable value of his services under a fixed fee contract where he has been discharged has not been decided by this court. *But see Fletcher v. Kellogg,* 55 App.D.C. 351, 6 F.2d 476, 478, *cert. denied,* 269 U.S. 555, 46 S.Ct. 18, 70 L.Ed. 408 (1925). Cases in other jurisdictions allowing such recovery would limit it to situations involving wrongful discharge of the attorney. *See, e.g., Oliver v. Campbell,* 43

---

6. We agree with the trial court's conclusion that post-October 1975 letters attempting to modify the October 6, 1975 agreement would fail for lack of consideration. *Nyhus v. Travel Management Corp.,* 151 U.S.App.D.C. 269, 274–75, 466 F.2d 440, 445–46 (1972) ("Modifying agreement must be supported by a consideration"). Since Chase was obligated by the October 6, 1975 letter to perform all services necessary to prosecute GBC's application to a "final disposition" by the FCC, his promises in later letters to perform pre-existing obligations do not constitute consideration. *Murray v. Lichtman,* 119 U.S.App.D.C. 250, 253 & n. 5, 339 F.2d 749, 752 & n. 5 (1964).

7. As explained in *Miller v. Avirom, supra,* 127 U.S.App.D.C. at 370 n. 11, 384 F.2d at 322 n. 11 (citing *Johnston v. Reily,* 82 U.S.App.D.C. 6, 7, 160 F.2d 249, 250 (1947)), the rule which prohibits consideration of issues not raised below

    is not a mere technicality but is of substance in the administration of the business of the courts. Enormous confusion and interminable delay would result if counsel were permitted to appeal upon points not presented to the court below. Almost every case would in effect be tried twice under any such practice. While the rule may work hardship in individual cases, it is necessary that its integrity be preserved.

Cal.2d 298, 305–06, 273 P.2d 15, 19–20 (1954); *Demov, Morris, Levin & Stein v. Glantz,* 53 N.Y.2d 553, 444 N.Y.S.2d 55, 57, 428 N.E.2d 387, 390 (1981). Accordingly, under the circumstances, we decline to decide a question of first impression in the absence of a developed record.

### D.

Finally Chase contends that the trial court erred in finding that Milton A. Gilbert did not at any time obligate himself as an individual to pay any money to Chase, that GBC "was not a sham, but a valid, adequately financed ongoing corporation formed upon the advice and under the direction of [Chase]" and that no basis existed for piercing the corporate veil. Because the trial court's findings are supported in the record and not clearly erroneous, we affirm. *Nelson-Bey v. Robinson, supra,* 408 A.2d at 1001–02.

It is settled that a corporation is regarded as a separate legal entity which is distinct from its shareholders. *Vuitch v. Furr,* 482 A.2d 811, 815 (D.C.1984); *Harris v. Wagshal,* 343 A.2d 283, 287 (D.C.1975); *Francis O. Day Co. v. Shapiro,* 105 U.S. App.D.C. 392, 396, 267 F.2d 669, 673 (1959). This general rule may be disregarded where the corporation is an alter ego of the shareholders and is a mere sham used by the shareholders to work an injustice. *Harris v. Wagshal, supra,* 343 A.2d at 287; *Francis O. Day Co. v. Shapiro, supra,* 105 U.S.App.D.C. at 396, 267 F.2d at 673. The test of whether a corporation is the alter ego of the shareholders is a practical one and must be determined to a great extent by assessing the particular factual circumstances. *Vuitch v. Furr, supra,* 482 A.2d at 816; *Valley Finance, Inc. v. United States,* 203 U.S.App.D.C. 128, 138, 629 F.2d 162, 177 (1980). In determining that a corporation is a mere sham or the alter ego of the shareholders, there must be proof by affirmative evidence that there is unity of ownership and interest, and that the corporate form has been used to perpetrate fraud or wrong. *Vuitch v. Furr, supra,*

482 A.2d at 819 (citations omitted). Thus, a court must consider whether there is evidence that a corporation was formed primarily to protect the shareholders' business from the claims of their judgment creditors, whether the shareholders commingled corporate funds with their personal funds, whether the formalities of the corporate form were for the most part disregarded, and whether the corporation was undercapitalized. *Id.* at 816; *see Harris v. Wagshal, supra,* 343 A.2d at 287.

■ Chase testified that he advised Mr. Gilbert to select the corporate form to enhance his chances of having his application approved, and Mr. Gilbert claimed that he selected the corporate form to insulate himself from personal liability. This court has recognized that "formation of a corporation in order to avoid personal liability is not standing alone, an abuse of the corporate form." *Harris v. Wagshal, supra,* 343 A.2d at 287. Nor is formation of a corporation to enhance one's chances of succeeding in a business venture, without more, evidence of a sham. Evidence was presented that the other principals participated in the day-to-day operations of GBC during its interim operation of the radio station and thereafter. Although Mr. Gilbert was the president and principal shareholder of GBC, the other principals made payments on their stock subscription and all payments for legal services, except the initial retainer sent by Mr. Gilbert in May 1971, were drawn on GBC's account; Chase submitted all of his bills to GBC. No evidence was presented to suggest that the corporation was not in full compliance with the laws of Delaware where it was incorporated. Chase himself reviewed the certificate of incorporation, recommended the initial method of financing, and proposed, drafted and filed the original stock subscription agreements for the six principals; he also filed amendments to GBC's radio license application when there were changes in the ownership and capitalization of GBC.

## IV

In its counterclaim, GBC contended that Chase was negligent in rendering legal services because he failed to exercise reasonable care in recommending that GBC raise the ministers' issue and neglected his duty by failing to eliminate or minimize or apprise GBC of the risk involved in raising the issue. As a direct and proximate result of Chase's negligence, GBC alleged, it was disqualified by the FCC Review Board decision of June 2, 1978, and that since all other applicants also were disqualified, GBC would have obtained the radio station license in the absence of Chase's negligence. GBC also alleged that Chase's negligence caused it to incur unnecessary legal and other expenses, as well as damages in excess of $500,000. On appeal, GBC argues that had Chase adequately investigated the involvement of a GBC principal in the illegal broadcasts, the information uncovered would have caused GBC either to document that the GBC principal (Mr. Amis) had reported the illegal broadcasts to his superiors in order to avoid a swearing contest in the licensure proceedings, or to change its decision to enlarge the issues rather than to appeal the Board's initial decision, or both. Relying on *Nosi v. Aiello*, 69 A.2d 57 (D.C.1949), the trial court found that Chase was not negligent and that, in any event, GBC had failed to show the proximate cause between that investigation and any damages which GBC had sustained in the FCC license proceedings.

"The elements of an action for professional negligence are the same as those of an ordinary negligence action." *O'Neill v. Bergan*, 452 A.2d 337, 341 (D.C.1982). The question of whether a party was negligent is generally a question of fact, *Aqui v. Isaac*, 342 A.2d 370, 371–72 (D.C.Cir.), *cited in Barrett v. Harris*, 406 A.2d 1266, 1267 (D.C.1979), and accordingly this court will reverse the trial court's findings of fact only if they are clearly erroneous or without support in the record. *Nelson-Bey v. Robinson*, *supra*, 408 A.2d at 1001–02. To show that an attorney has been negligent, a party must prove: (1) that there is an attorney-client relationship; (2) that the attorney neglected a reasonable duty; and (3) that the attorney's negligence resulted in and was the proximate cause of a loss to the client. *Niosi v. Aiello*, *supra*, 69 A.2d at 60; *see McCord v. Bailey*, 204 U.S.App. D.C. 334, 337, 636 F.2d 606, 609 (1980), *cert. denied*, 451 U.S. 983, 101 S.Ct. 2314, 68 L.Ed.2d 839 (1981); *Parksville Mobile Modular, Inc. v. Fabricant*, 73 A.D.2d 595, 599, 422 N.Y.Supp.2d 710, 716 (1979). Expert testimony must be presented to establish the standard care "unless the attorney's lack of care and skill is so obvious that the trier of fact can find negligence as a matter of common knowledge." *O'Neil v. Bergan*, *supra*, 452 A.2d at 341.

To meet its burden, GBC relies on the "undisputed evidence" that Chase did not do more than make a few casual inquiries of the GBC principal who was involved in the ministers' broadcasts and on the testimony of Chase's expert witness, Judge Naumowicz, an FCC Administrative Law Judge. The "undisputed" evidence reveals that on July 1, 1976, Chase had requested a meeting with Mr. Gilbert and the other GCB principals to discuss the FCC's initial decision, explain the procedures and prospects for reversal on appeal, and the ramifications of the ministers' issue on GBC's future course of action. Relying on a prior FCC decision involving similar facts, Chase explained that rather than appealing the initial decision, GBC could petition the Review Board to reopen the record and to remand the case for a further hearing on issues relating to whether GBC's competitors should be disqualified because of the illegal broadcasts; the GBC principals decided to petition to reopen the record and enlarge the issues. At this meeting, Chase first learned that one of the GBC principals, Herman Amis, had served as an announcer on two of the illegal broadcasts. Upon questioning, Mr. Amis claimed that he had reported the nature of the program to his superiors and to the radio station management. Judge Naumowicz testified that before raising the ministers' issue, an

attorney exercising reasonable skill and care in the field of communications law would be required (1) to contact Mr. Amis to ascertain his involvement, if any, as well as that of the other principals, in the illegal broadcasts, so as to be able to assess the risk to GBC, and (2) to apprise GBC of the information developed from Mr. Amis and of the risk to GBC's application in raising the ministers' issue; the judge did not testify that making a paper trial was part of an FCC lawyer's duty.

The supplemental initial FCC decision found that Mr. Amis' involvement would not disqualify GBC, and disqualified GBC on another basis. Although the Review Board reversed this decision and disqualified GBC (as well as the other applicants) on the basis of character faults arising from its handling of Mr. Amis' involvement, the FCC subsequently granted GBC's petition to reopen the record to offer exculpatory evidence, in the form of a recantation by the manager of WNJR of his earlier testimony that Mr. Amis had not informed him of the illegal broadcast. The FCC ultimately granted the WNJR license to Sound Radio, Inc. and approved a settlement between GBC and Sound Radio, Inc. in which Sound reimbursed GBC for some of GBC's investment and expenses.

We hold that, even assuming negligence by Chase, GBC has failed to establish that his negligence caused it to be disqualified for the radio station license. The movant must show that his attorney's negligence caused a legally cognizable injury. *See McCord v. Bailey, supra,* 204 U.S.App. D.C. at 339, 636 F.2d at 611. Although it is sufficient to show that the movant could have "fared better" in reaching the ultimate goal sought, *see Parksville Mobile Modular, Inc. v. Fabricant, supra,* 73 A.D.2d at 599–600, 422 N.Y.S.2d at 716–17, or that there would have been a difference in the trial's outcome, *Niosi v. Aiello, supra,* 69 A.2d at 60; *McCord v. Bailey, supra,* 204 U.S.App.D.C. at 340, 636 F.2d at 612, more is required than speculation. What GBC might have done, and what the result would have been had GBC either put in writing Mr. Amis' report to his superiors or appealed the FCC's initial decision, involves the kind of speculation which courts have rejected as grounds for holding that an attorney has been negligent in performing his duty to his client. Also, even assuming for purposes of argument that had Chase not withdrawn, by letter of June 17, 1978, from the FCC proceeding he would have had an opportunity to correct the situation, we conclude that the additional expenses and speculative damages which GBC alleges are insufficient to show proximate cause in relation to producing a different result in the ultimate outcome.

Accordingly, the judgment is affirmed.