**BREEZEVALE LIMITED, Appellant,**

v.

**Timothy L. DICKINSON,
et al., Appellees.**

**No. 97–CV–2076.**

District of Columbia Court of Appeals.

Argued Sept. 30, 1999.

Decided Sept. 21, 2000.

Plato Cacheris, with whom Preston Burton, Washington, DC, Sydney Hoffmann, and Leslie A. Powell were on the brief, for appellant.

Theodore J. Boutrous, Jr., with whom Jonathan K. Tycko, Hassan A. Zavareei, Washington, DC, and John H. Sharer, Los Angeles, CA, were on the brief, for appellees.

Before STEADMAN, SCHWELB and RUIZ, Associate Judges.

STEADMAN, Associate Judge:

Breezevale Limited ("Breezevale") is a former client of the law firm of Gibson, Dunn & Crutcher LLP ("GDC"). In a legal malpractice action against GDC,[1] a jury found that GDC had mishandled a lawsuit filed by Breezevale against Bridgestone–Firestone, Inc. and Firestone Export Sales Corp. (collectively "Firestone"), resulting in $3,430,000 in damages. The damage award reflected the amount that Breezevale hypothetically would have won had its case against Firestone gone to a jury instead of settling due to GDC's alleged malpractice.

Citing evidentiary insufficiency, the trial court set aside the jury's verdict and entered judgment as a matter of law in favor of GDC. In the alternative, the court granted a new trial. Further, the trial court concluded that Breezevale had engaged in bad faith litigation and ordered it to pay GDC $5,356,633 in fees and costs, punitive damages, and unpaid legal fees. We reverse the entry of judgment as a matter of law insofar as it relates to two of

---

1. More precisely, Breezevale brought suit against the partners of the firm, who are the actual appellees. For convenience, we refer to the firm as a collective singular appellee.

the three claims underlying the litigation, but affirm the entry of judgment as to the third underlying claim. We remand the grant of a new trial for further consideration. We vacate without prejudice the order awarding sanctions for bad faith litigation and unpaid legal fees.

## FACTUAL SUMMARY[2]

### *Phase One: Breezevale v. Firestone*

In October 1989, Breezevale hired GDC to investigate and pursue several potential claims against Firestone arising from business dealings involving Iraq and Nigeria. In 1990, on GDC's advice, Breezevale brought suit in the United States District Court for the Northern District of Ohio,[3] seeking damages of approximately $20,-000,000. Its first two sets of claims alleged that Firestone had committed breach of contract and fraud in its sale of tires to Iraq in 1988 and 1989 while it had an exclusive distributorship agreement with Breezevale ("1988 Iraq claim" and "1989 Iraq claim" respectively). Its third claim alleged that Firestone had breached a promise to develop a manufacturing plant in Nigeria with Breezevale ("Nigeria claim"). There is no dispute that Ohio law governed the action.

Discovery began in preparation for trial. At some point in mid–1991, Firestone offered to settle the case by paying Breezevale $3,500,000 and entering into a five-year distribution agreement for Nigeria, but Breezevale rejected the offer on GDC's advice. Discovery continued accordingly, including the scheduling of a particular Breezevale employee for deposition on October 14, 1991. On the night of October 13, however, a legal bomb dropped when that employee revealed to a GDC associate attorney that she planned to testify during her deposition that she had personally forged certain documents produced to Firestone, specifically offer letters dated late 1987 pertaining to the sale of tires to Iraq, at the direction of and with the participation of a certain Breezevale executive.

The following morning, just before the deposition, the GDC associate took the Breezevale employee to the office of a GDC partner to discuss the situation and ask how to proceed. The partner decided that the deposition should go forward without immediately notifying Breezevale, even though someone from Breezevale actually phoned during the meeting. However, after uneventful morning testimony, the partner and the associate did go to Breezevale's offices during the lunch break and advise a different Breezevale executive of the impending testimony. The executive immediately asserted that the employee was lying and asked the partner to delay the deposition until GDC could investigate the allegations. The partner refused, and the employee proceeded to give her damaging testimony that afternoon. On a subsequent day, she also retrieved from her home certain "corroborating evidence" of the forgeries. This evidence was made part of the deposition record.

Firestone's attorneys immediately began drafting a motion to dismiss all of Breezevale's claims with prejudice as a sanction for fraud and misconduct. Upon threat of imminent filing of the motion, and with GDC's advice, Breezevale settled with Firestone for $100,000.

### *Phase Two: Breezevale v. GDC*

In October 1994, Breezevale filed suit against GDC in the District of Columbia

---

2. Although numerous factual aspects in this extensive record covering two major lawsuits were in hot dispute, we present this highly truncated summary of the proceedings, as we must in reviewing a grant of judgment as a matter of law, in the light most favorable to Breezevale. *See Homan v. Goyal,* 711 A.2d 812, 817 (D.C.1998).

3. Breezevale originally brought suit in the United States District Court for the District of New Jersey, but the case was transferred to Ohio.

Superior Court for legal malpractice in its handling of the Firestone litigation. Breezevale basically contended that GDC had abandoned its client upon learning of the impending damaging deposition testimony, even though adequate investigation would have revealed that the employee was lying. According to Breezevale, GDC thus violated the legal standard of care and irreparably damaged Breezevale's suit against Firestone. Breezevale initially argued both that GDC's malpractice prevented a better settlement and that it prevented Breezevale from prevailing at trial. However, the trial court ultimately ruled that the "better settlement theory" was too speculative and instructed the jury only on the "trial theory."[4]

Under the "trial theory," Breezevale sought damages in the amount it would have hypothetically been awarded had its case against Firestone gone to trial in Ohio. Thus, the actual jury in the malpractice case against GDC also acted as a "hypothetical jury" hearing the Ohio case against Firestone. *See Thomas v. Bethea,* 351 Md. 513, 718 A.2d 1187, 1197 (1998) (" 'this is the accepted and traditional means of resolving the issues involved in the underlying proceeding in a legal malpractice action' and 'avoids speculation by requiring the plaintiff to bear that burden of producing evidence that would have been required in the underlying action' ") (quoting RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE § 14.3, at 237–38 (4th ed.1996 and Supp.1998)); *see also Niosi v. Aiello,* 69 A.2d 57, 60 (1949).

Both sides presented expert testimony on the legal standard of care. Although both experts agreed that the employee's deposition would have eventually gone forward, Breezevale's expert testified that GDC breached the standard of care by (1) failing to inform Breezevale promptly of the employee's expected testimony; (2) failing to advise the employee immediately that GDC could no longer act as her attorney since she now had a conflict of interest

with Breezevale and that she should obtain separate counsel; (3) failing to postpone the deposition so that GDC could (a) recommend settlement immediately, (b) investigate and be prepared to discredit the employee at the eventual deposition, and/or (c) investigate and recommend withdrawal of any forged documents and amendment of any related interrogatories; and (4) advising Breezevale to settle without first informing it that GDC had developed a personal conflict of interest to the extent it was worried about its own liability as a conduit of the documents.

After seven weeks of trial, the jury awarded Breezevale $3,430,000 by way of a special verdict form. Specifically, the jury found that GDC had breached the standard of care in its representation of Breezevale and thereby proximately caused damage to Breezevale's case against Firestone. The jury further found that forgeries did occur with the participation of "one or more Breezevale executives," but that such forgeries did not "play[ ] a substantial part in damaging" Breezevale's lawsuit against Firestone and that Breezevale still would have won $1,500,000 on its 1988 Iraq claim for breach of contract and fraud, $730,000 on its 1989 Iraq claim for breach of contract (but not fraud), and $1,200,000 on its Nigeria claim based on promissory estoppel.

Notwithstanding the verdict, the trial court entered judgment as a matter of law in favor of GDC. It based its decision on three grounds. First, in light of the factual finding of forgery, the court found no evidence to support the jury's conclusion that GDC's malpractice proximately caused Breezevale's loss. The court reasoned that delaying the deposition would only have postponed subsequent events, not avoided them. Second, in light of the finding of forgery, the court concluded that Breezevale's own actions had proximately caused their losses and that Breezevale was therefore necessarily contributorily

---

**4.** Breezevale does not appeal this ruling.

negligent. Third, the court found no evidence to support the jury's findings on damages. In the alternative, in a single sentence, the court granted a new trial on the ground that the verdict was against the clear weight of the evidence.

Just when Breezevale may have thought things could get no worse, they did. After trial and its ruling granting judgment as a matter of law, the court considered GDC's "equitable counterclaim" for bad faith litigation from the bench. Consistent with the jury's factual finding of forgery by a preponderance of the evidence, *see Lewis v. Sears Roebuck & Co.,* 845 F.2d 624, 629–30 (6th Cir.1988) (stating that trial court considering equitable claim with common factual issue as legal claim decided by jury should not make contrary or inconsistent finding), the trial court found by clear and convincing evidence that forgery had occurred with the participation of one or more Breezevale executives. Concluding that it was "difficult to imagine a clearer case of bad faith litigation," the court ordered Breezevale to pay GDC a total of $5,356,633, including $4,061,353 for GDC's fees and costs in litigating the malpractice action, $1,000,000 in punitive damages, and $295,280 in unpaid legal fees from the original Firestone litigation.

## ANALYSIS

### I. Judgment As A Matter of Law

■■■ For the trial court to grant judgment as a matter of law, there must exist "no legally sufficient evidentiary basis for a reasonable jury" to find for the non-moving party. *See* Super. Ct. Civ. R. 50. As we have often said:

[I]t is only in the unusual case, in which only one conclusion could reasonably be drawn from the evidence, that the court may properly grant judgment notwithstanding the verdict. Moreover, it is the responsibility of the jury (and not the judge) to weigh the evidence and to pass upon the credibility of the witnesses. If impartial triers of fact could reasonably find the plaintiff's evidence sufficient, the case may not be taken from the jury.

*Homan, supra,* 711 A.2d at 817–18 (citations omitted).[5] "In reviewing a motion for judgment as a matter of law after a jury verdict, this court applies the same standard as the trial court." *Durphy v. Kaiser Foundation Health Plan of Mid-Atlantic States, Inc.,* 698 A.2d 459, 465 (D.C.1997). These considerations guide our review of the trial court's action here.

### A. Proximate Cause

■■■ To establish proximate cause, Breezevale had to show by a preponderance of the evidence that GDC's negligence "caused a legally cognizable injury." *See Chase v. Gilbert,* 499 A.2d 1203, 1212 (D.C.1985). "Although it is sufficient to show that the movant could have 'fared better' in reaching the ultimate goal sought, or that there would have been a difference in the trial's outcome, more is required than speculation." *Id.* (citations omitted). "The issue of proximate cause is usually a question of fact for the jury to decide. Only if there are absolutely no facts or circumstances from which a jury could reasonably find that the defendant was negligent, and that such negligence was the proximate cause of injury, would the matter be a question of law for the court." *Bragg v. Owens–Corning Fiberglas, Corp.,* 734 A.2d 643, 648 (D.C.1999) (citations omitted).

---

5. In *Oxendine v. Merrell Dow Pharmaceuticals, Inc.,* 506 A.2d 1100, 1103 (D.C.1986) we stated that judgment as a matter of law is only appropriate in "extreme cases." But by that phrase we were only recognizing that grants of such judgments are unusual under the required standard. Where the standard is met and there is no legally sufficient evidence, it is the duty of the trial court to enter judgment as a matter of law. *See W.M. Schlosser Co., Inc. v. Maryland Drywall Co., Inc.,* 673 A.2d 647, 650–51 (D.C.1996) (stating that this court is "obliged to reverse" the trial court's denial of a motion for judgment as a matter of law if no reasonable jury could have reached the verdict reached on the evidence presented).

■ Breezevale's bottom-line position, as it went to the jury, was that absent GDC's malpractice, Breezevale could have proceeded to trial and ultimately prevailed. Looking at the record in the light most favorable to Breezevale, we cannot agree with the trial court that there was no evidence from which a reasonable jury could find support for that theory. The trial court may well be correct that GDC could not have found exculpatory evidence during an investigation, that the employee would have eventually testified, and that Firestone would have taken the same position as it did. However, the trial court's conclusion that these developments would have caused the "inevitable destruction" of Breezevale's case against Firestone does not necessarily follow. The jury's verdict here indicates the contrary.

Breezevale's expert testified that GDC violated the standard of care at several points leading up to and including the refusal to postpone the deposition. He also testified that, had GDC ultimately discovered that the employee's allegations were in fact true, GDC could have ethically advised Breezevale to withdraw the relevant documents and amend any related interrogatories. In his opinion, GDC's actions forced Breezevale into a "box" by the time of the $100,000 settlement offer. A reasonable jury could conclude from this testimony that GDC's malpractice substantially crippled Breezevale's ability to get to trial. Although the thrust of Breezevale's argument at trial was that GDC would have discovered during a hypothetical investigation that the employee was lying, not that they would have discovered she was telling the truth and recommended withdrawal of the documents and amendment of the interrogatories, the jury's verdict must, if possible, be reconciled with the totality of the evidence presented to it.[6] This jury knew of Breezevale's fraud and concluded that Breezevale nonetheless would have

prevailed at trial. We do not think this conclusion was without any support. *See infra* notes 9 and 11. *Cf. Washington Welfare Ass'n v. Poindexter*, 479 A.2d 313, 315 (D.C.1984) ("when there is some evidence from which jurors could find the necessary elements, ... or when the case turns on disputed facts and witness credibility[,] ... the case is for the jury") (internal quotation marks and citation omitted).

## B. Contributory Negligence

■ "To assert the defense of contributory negligence, a party must establish, by a preponderance of the evidence, that the plaintiff failed to exercise reasonable care, and that this failure was a substantial factor in causing the alleged damage or injury." *Massengale v. Pitts*, 737 A.2d 1029, 1031 (D.C.1999) (internal quotation marks and citation omitted). Contributory negligence is a complete bar to recovery. *See id.* at 1031–32; *see also Durphy, supra,* 698 A.2d at 467 (in medical malpractice context, "contributory negligence is a valid defense if the patient's negligent act concurs with that of the physician and creates an unreasonable risk of improper medical treatment" but not if "the patient's negligent act merely precedes that of the physician and provides the occasion for medical treatment").

■ In this case, the trial court found "no question on this record that the take-it-or-leave-it $100,000 settlement offer Firestone finally made was a direct result of the forged documents. Thus, no reasonable juror could have failed to conclude Breezevale was contributorily negligent." It seems to us that this poses somewhat the wrong question. The issue is not whether the employee's allegations were a substantial factor in Firestone's decision to make a particular settlement offer. The issue is whether, if GDC had exercised due care, the employee's allegations would

---

**6.** The verdict form itself recognized that damages might be awarded even if Breezevale

was found to have forged the documents.

have substantially affected Breezevale's prospects of proceeding to trial and ultimately prevailing. The jury answered this question in the negative, finding that the forgeries [7] did not "play[ ] a substantial part" in damaging Breezevale's lawsuit against Firestone. In fact, the trial court itself acknowledged in its order that there was sufficient, albeit weak, evidence to support the jury's finding that a contract existed between Breezevale and Firestone in 1988. This was the only claim to which the forged offer letters arguably related. Since there was some evidence to support the jury's verdict, see *Poindexter, supra,* 479 A.2d at 315, judgment as a matter of law was inappropriate.[8]

### C. Proof of Damages

 To recover damages in its suit against GDC, Breezevale had to establish the amount it hypothetically would have won (taking into account the forgery issue) from a federal court jury in Ohio had its case against Firestone gone to trial. Under District law, which governed the malpractice suit, "a plaintiff is not required to prove the amount of his damages precisely; however, the fact of damage and a reasonable estimate must be established." *Bedell v. Inver Housing, Inc.,* 506 A.2d 202, 205 (D.C.1986) (citation omitted).

The trial court here concluded that Breezevale had not sufficiently established damages on any of its three claims against

Firestone under Ohio law and therefore, necessarily, had failed to establish any damages against GDC under District law. In reviewing this alternative basis for the judgment, we keep in mind that under Ohio law, much as under our own, "[w]hen reviewing a damages award, an appellate court must not reweigh the evidence, and may not disturb an award of damages unless it ·lacks support from any competent, credible evidence," *Srail v. RJF Int'l Corp.,* 126 Ohio App.3d 689, 711 N.E.2d 264, 273, *appeal not allowed,* 82 Ohio St.3d 1473, 696 N.E.2d 602 (1998). We will consider each of the underlying claims against Firestone in turn.

 **1. 1988 Iraq Claim.** Under Ohio law, "in order for a plaintiff to recover lost profits in a breach of contract action the amount of the lost profits, as well as their existence, must be demonstrated with reasonable certainty." *Gahanna v. Eastgate Properties, Inc.,* 36 Ohio St.3d 65, 521 N.E.2d 814, 818 (1988). As to the amount of damages, a reasonable certainty "has been defined as 'that degree of certainty of which the nature of the case admits.'" *Bemmes v. Public Employees Retirement System of Ohio,* 102 Ohio App.3d 782, 658 N.E.2d 31, 36 (1995) (quoting 22 AM.JUR.2D *Damages* § 25 (1988 & Supp.1995)); *cf. Endersby v. Schneppe,* 73 Ohio App.3d 212, 596 N.E.2d 1081, 1084 (1991) (lost profit award should be "sub-

---

7. The jury was instructed to decide whether forgery occurred by a "preponderance of the evidence," the standard for proving fraud in an action for money damages under Ohio law. *See Household Finance Corp. v. Altenberg,* 5 Ohio St.2d 190, 214 N.E.2d 667 (1966). On appeal Breezevale argues the jury should have been instructed under District law. Assuming *arguendo* that this is true, the result is the same. "A party asserting the defense of contributory negligence is required to establish, by a preponderance of the evidence, that the plaintiff failed to exercise reasonable care." *Poyner v. Loftus,* 694 A.2d 69, 71 (D.C.1997). Our rule that "fraud" must be proven by "clear and convincing evidence," *see Kitt v. Capital Concerts, Inc.,* 742 A.2d 856, 861 (D.C.1999), is inapplicable here since GDC does not claim or defend that

Breezevale defrauded them, but rather asserts that, even if their own conduct fell below the applicable standard of care, so did Breezevale's. The fact that Breezevale's conduct allegedly included deceitful ("fraudulent") acts does not raise the standard of proof. *Cf. Shea v. Fridley,* 123 A.2d 358, 363 (D.C.1956) (discussing third party complainant's burden of proving by a preponderance that landlord failed to exercise necessary care due to gross negligence, willful conduct, or fraud).

8. We cannot agree with GDC that our disposition effectively rewards Breezevale for "duping" the jury. The jury specifically found that forgery did occur, despite Breezevale's steadfast representations to the contrary, so it is difficult to see how the jury was "duped."

stantiated by calculations based on facts available or in evidence").

■ The trial court concluded that Breezevale failed to adequately establish the amount of damages on its 1988 Iraq claims. Breezevale contends that the jury's award of $1,500,000 permissibly represented a 5% commission on $30,000,000 in Firestone tire sales made to Iraq in 1988 through another distributor, FOCOEX. Viewed in the light most favorable to Breezevale, some evidence was before the jury to support both those figures.[9] Although GDC asserts that a "commission" theory was never expressly argued to the jury, again, in reviewing a grant of judgment as a matter of law, we must attempt to reconcile the jury's verdict with the evidence offered. *See Poindexter, supra*, 479 A.2d at 315.

■ **2. 1989 Iraq claim.** As to this claim, the trial court concluded that there

was no evidence that an exclusive distributorship agreement even existed between Breezevale and Firestone in 1989.[10] Under Ohio law, "[p]arties may orally or by informal memoranda, or by both, agree upon all essential terms of [a] contract and effectively bind themselves, if that is their intention, even though they contemplate the execution, at a later time, of a formal document to memorialize their undertaking." *Arnold Palmer Golf Co. v. Fuqua Industries, Inc.*, 541 F.2d 584, 589 n. 3 (6th Cir.1976). Whether a contract existed is a question of fact to be resolved by the finder of fact. *See Cork v. Bray*, 52 Ohio St.3d 35, 555 N.E.2d 936, 940 (1990). In this case, viewing the evidence in the light most favorable to Breezevale, there was some evidence, albeit weak, consistent with an exclusive distributorship agreement having existed in 1989.[11] *See Poindexter, supra*, 479 A.2d at 315.

9. Evidence supporting the 5% figure included: (1) a Firestone fax sheet, dated September 23, 1987, approving certain tire exports to Syria and Iraq on the condition that "[s]hipments to Iraq subject to 5 pct commission for our distributor Breezevale"; (2) a Firestone fax sheet, dated June 7, 1988, discussing a possible one-time export of tires to Iraq by Firestone's Kuwaiti distributor at prices including "5% over FOB for Breezevale"; and (3) testimony by a Breezevale director that Breezevale received a 5% commission when Firestone sold tires to Iraq without going through Breezevale. Evidence supporting a commission in general included: (1) a Firestone fax sheet, dated February 8, 1988, recommending that Firestone "reserve a commission for Breezevale" in a deal involving the sale of Spanish tires to Iraq where "middlemen not allowed"; (2) a Firestone fax sheet, dated June 9, 1988, pertaining to a "San Diego dealer" and stating, "Advise we can quote reserving a commission for Breezevale."; (3) a letter on Firestone letterhead, dated July 14, 1988, indicating that "[o]n previous occasions payments of commissions has been discussed with Breezevale," that 1% of the FOB value of a certain deal was paid to Breezevale in 1985 for its services, and that a fixed fee equivalent to less than 1/2% of the total FOB value was appropriate in the instant situation; and (4) a Firestone fax sheet, dated September 17, 1988, referring to a "recent request" and stating, "We advise that Breezevale Ltd. are our non-exclusive distrib-

utors.... We recommend that we sell thru them or reserve a commission for them. We must prior discuss same with them."

Evidence supporting the $30,000,000 figure included: (1) a Firestone fax sheet, dated March 16, 1989, stating that FOCOEX is "making substantial profits as their sales price appears to be in excess of U.S. dollar 30 million"; and (2) the July 14, 1998 letter discussed *supra*, indicating that payment of a $125,000 fixed fee to Breezevale would represent "less than 1/2% of the total FOB value" of an agreement between Firestone and FOCOEX of Spain (which calculates to $25,000,-000).

10. The trial court did not address the *amount* of damages on the 1989 Iraq claim, and neither party significantly addresses this issue in their briefs, so we limit our review to whether there was sufficient evidence of a contract to survive judgment as a matter of law.

11. Breezevale cites several documents as evidence of an exclusive distributorship, including: (1) a Firestone fax sheet, dated January 31, 1989, stating, "Since Breezevale Ltd. are our distributors we advise that all quotations should be channelled thru them."; (2) a Firestone document, dated February 3, 1989, thanking a company for its inquiry and stating, "We nevertheless regret to tell we cannot quote directly to you, as we are represented in Irak by 'Breezevale Ltd' "; (3) a Firestone fax

**3. Nigeria Claim.** The damages on the Nigeria claim present another question. Unlike the Iraq claims for lost profits, on this claim Breezevale sought only reimbursement for actual expenditures made in reliance on Firestone's promise. While one might expect the amount of such damages to be more easily proved, the only evidence Breezevale in fact offered on this issue was the following testimony by a Breezevale executive:

Q. Now did you—did Breezevale spend any money in connection with the efforts to construct a plant, tire plant in Nigeria?

A. Yes, sir.

Q. Approximately how much money did Breezevale spend in connection with that tire plant project?

A. About one million 200,000 dollars.

Without challenging the jury's obvious crediting of this testimony, evinced by its eventual $1,200,000 award of damages related to this claim, the trial court concluded that the executive's testimony was insufficient to create the "reasonable certainty" as to damages required by Ohio law because, "[a]bsent some independent corroboration, there would be no way for a jury to determine if [the executive's] conclusory assertion [was] based on fact." [12]

Under Ohio law, conclusory testimony proffered by a business owner is insufficient to establish lost profits. *See Endersby, supra,* 596 N.E.2d at 1084 (finding award of lost profits "uncertain and purely speculative" where only evidence was business owner's testimony as to expected profits, which was "phrased generally and [did] not provide a necessary basis for calculation of either actual or anticipated but unrealized profit"). Although Breezevale sought to recover actual expenditures rather than lost profits in its Nigeria claim, Breezevale does not identify, and we have not found, any case under Ohio law establishing a more lenient standard for proving actual damages than lost profits.[13] Indeed, under our own law, such evidence would be insufficient to establish actual damages. *See Bedell, supra,* 506 A.2d at 202 (affirming award of $1000 nominal damages to art gallery owner who

sheet, dated February 14, 1989, stating, "We further were advised by Breezevale that you promised to advise FOCOEX ... that Breezevale Ltd. are our distributors for Iraq."; (4) a Firestone fax sheet, dated February 22, 1989, asking "how you propose to advise or have advised FOCOEX that Breezevale is our distributor for Iraq within the framework of the new 1989 tender for Iraq"; (5) a Firestone fax sheet, dated March 13, 1989, referring to a meeting with FOCOEX and Breezevale and stating that "there is no reason that Breezevale cannot handle this export business"; and (6) a Firestone fax sheet, dated March 16, 1989, stating, "Breezevale will again fax you Iraq requirements for delivery starting September 1989 which as you have stated is the month that current shipments will have been finalized under the current contract."

12. Breezevale points out that, in describing GDC's handling of the Firestone litigation, a GDC partner also testified that "Breezevale had spent a bunch of money." However, in addition to going more to the fact of damages than their amount, such testimony by Breezevale's former attorney would obviously not have been heard by a hypothetical Ohio jury.

13. Although neither party cites it, in an unpublished opinion last year, the Ohio Court of Appeals did allow the use of conclusory testimony by a business owner to establish her past earnings for purposes of calculating future lost wages from personal injury. *See Smith v. Lima Mem. Hosp.,* 1999 WL 378364, 1999 Ohio App. LEXIS 2367, *appeal not allowed,* 87 Ohio St.3d 1409, 716 N.E.2d 1170 (1999). However, the court expressly stated that "the best proof available under the facts should be required" to prove damages, *see id.* at *2, 1999 Ohio App. LEXIS at *5; *cf. Bemmes, supra,* 658 N.E.2d at 36 ("reasonable certainty ... has been defined as 'that degree of certainty of which the nature of the case admits' ") (citation omitted), and specifically concluded that Smith's memory was "the best available evidence" of her past earnings on the facts of that case, *id.* at *3, 1999 Ohio App. LEXIS at *6. In contrast, there is no reason to believe in the instant case that the executive's testimony was "the best available evidence" of the expenditures of an established international company on a major project, at least absent some explanation for the lack of documentation.

claimed $78,500 worth of water damage to artwork, where only proof of damages was "a list prepared by appellant of damaged items and their undocumented dollar values," which "provided an inadequate basis for developing a reasonable estimate of appellant's losses" under District law). Thus, the trial court properly concluded that Breezevale failed to establish damages on its Nigeria claim. Accordingly, we affirm the entry of judgment as a matter of law to the extent it pertains to this claim.

## II. New Trial

 "In contrast to a motion for judgment notwithstanding the verdict, which requires the court to consider the evidence in the light most favorable to the non-moving party, a motion for new trial requires consideration of all the evidence, both favorable and unfavorable." *Lyons v. Barrazotto,* 667 A.2d 314, 324 (D.C.1995) (citation omitted); *see also Fisher v. Best,* 661 A.2d 1095, 1098 (D.C.1995) ("ordering a new trial is quite different from entering judgment notwithstanding the verdict"). Since the trial court, unlike the appellate court, has had the benefit of seeing and hearing the trial first hand, a "ruling on a motion for new trial is committed to the sound discretion of the trial court and will be reversed on appeal only if that discretion has been abused." *Oxendine, supra,* 506 A.2d at 1110; *see also District of Columbia v. Murtaugh,* 728 A.2d 1237, 1241 (D.C.1999) ("trial court has broad latitude in passing on a motion for new trial") (citation omitted). "The trial judge's latitude in passing upon a motion for a new trial is greater than that accorded to an appellate court." *Fisher, supra,* 661 A.2d at 1098.

 At the same time, however, the trial court may not set aside a jury verdict merely because it would have reached a different result had it acted as the trier of fact. *See Lyons, supra,* 667 A.2d at 325; *Durphy, supra,* 698 A.2d at 469. "In reviewing an order granting a new trial, this court scrutinizes more strictly orders predicated upon a reweighing of the evidence in order to protect the litigants' right to jury trial. Such motions should be granted only if the verdict is against the great—not merely the greater—weight of the evidence." *Lyons, supra,* 667 A.2d at 328–29 (internal quotation marks and citations omitted). If the verdict is against the great (or "clear"[14]) weight of the evidence then, even though there may be sufficient evidence that precludes entry of a directed verdict or judgment notwithstanding the verdict, the exercise of the trial court's discretion to set aside the verdict and order a new trial is "not in derogation of the right of trial by jury but is one of the historic safeguards of that right." *Fisher, supra,* 661 A.2d at 1098.

 In this case, the trial court focused almost exclusively on the motion for judgment notwithstanding the verdict in making its ruling.[15] As to the motion for new trial, it merely stated: "Because [GDC] are entitled to judgment as a matter of law, it follows they are also entitled to a new trial because the jury's verdict is against the clear weight of the evidence." Given the comprehensive assessment of the evidence necessary to rule on a new trial motion, *see Lyons, supra,* 667 A.2d at 324, the trial court's summary grant of a new trial by reference to the judgment notwithstanding the verdict, without express consideration of the evidence on both sides and its relative weight, causes difficulty in terms of appellate review.

 This is a complicated case involving a great deal of testimony and evidence, all of which the trial court had the benefit of seeing and hearing first hand. It may

---

14. *See Richbow v. District of Columbia,* 600 A.2d 1063, 1066 (D.C.1991) ("what variously has been described as the 'clear' or 'great' weight of the evidence ").

15. In their briefs to this court, the parties also focused on the judgment as a matter of law and spent little time on the new trial issue.

be that, even if, as we have concluded, the evidence was sufficient to go to the jury, after weighing the evidence and considering how the jury evaluated the evidence in returning a verdict for Breezevale, the trial court will conclude that a new trial is warranted because the verdict is against the clear or great weight of the evidence. *See Oxendine, supra,* 506 A.2d at 1110. However, in the absence of the trial court's analysis applying the standard for new trial motions, we are unable to conduct our appellate review with the proper level of scrutiny. Furthermore, there may be a question on the trial court's intended scope of the new trial, in light of the several findings of the jury. Under the circumstances, we remand the case to the trial court to consider further its grant of a new trial.[16] The court may then rule on whether there should be a new trial, and, if so, the grounds therefor and whether the new trial, should be on "all or part of the issues" pursuant to Super. Ct. Civ. R. 59(a).[17]

### III. Sanctions

■■■ The trial court has "inherent power" to sanction parties for intentionally abusing the litigation process. *See Jemison v. Nat'l Baptist Convention USA, Inc.,* 720 A.2d 275, 282 (D.C.1998). Although GDC filed its request for sanctions against Breezevale as a "counterclaim," the record indicates that the trial court in fact largely treated it as a motion for sanctions, so we

also treat it as such for purposes of this appeal.[18]

■■■ Given the "inherent power" of the trial court, sanctions may properly be imposed against a party found to have forged documents in an apparent attempt to bolster a portion of its case and then steadfastly lied about it while litigating another case, so long as they are proportionate to the conduct and to the matter at issue in the litigation. As we explained in *Synanon Foundation, Inc. v. Bernstein,* 517 A.2d 28 (D.C.1986) (*Synanon II* ):

> [T]he conduct which would justify an award of bad faith attorneys' fees may be found either in the filing of a frivolous claim or in the manner in which a properly filed claim is subsequently litigated. The measure of the fee award differs depending on which is the case. Bad faith attorneys' fee awards are limited to payment for work and expense attributable to the guilty party's bad faith endeavors. Therefore, where a suit has been filed in bad faith, the court has discretion to award the entire legal expenses incurred by the defendant. Conversely, in an action not in itself brought in bad faith, an award of attorneys' fees should be limited to those expenses reasonably incurred to meet the other party's groundless, bad faith procedural moves.

*Id.* at 38–39 (internal quotation marks and citations omitted).

---

16. The trial court's grant of a new trial is an order normally not subject to interlocutory appeal and is before us at all at this point only because it comes coupled to the grant of judgment as a matter of law. *See Lyons, supra,* 667 A.2d at 324 n. 14 ("Although an order granting a new trial is not appealable ordinarily until after the new trial has been held, an exception is made where, as here, the trial court granted the motion for judgment notwithstanding the verdict and, in the alternative, the motion for a new trial.").

17. A new trial may be granted under Rule 59 "for any of the reasons for which new trials have been granted in actions at law in the courts of the United States or of the District

of Columbia." See the extrinsic discussion of various grounds in 11 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE: Civil 2d §§ 2805 to 2810 (1995). As to partial new trials, see *id.* at § 2814.

18. The court expressly recognized before trial that the ultimate issue was whether Breezevale's filing suit against GDC constituted an "abuse of the judicial process," the hallmark basis for imposing sanctions, *see Jemison, supra,* 720 A.2d at 282; *Chevalier v. Moon,* 576 A.2d 722, 724 (D.C.1990), and agreed at Breezevale's request to bifurcate the equitable issue of bad faith litigation for a bench ruling after the jury returned its verdict.

The problem here, however, is that the trial court's imposition of sanctions appears, for purposes of appellate review, to be inextricable from its legal conclusion, reflected in its grant of judgment as a matter of law, that Breezevale's suit against GDC had no substantive merit whatever. We have previously expressed our disagreement with this conclusion, which cannot be reconciled with the jury's verdict. An exercise of discretion must rest on correct legal principles, *see Knight v. Georgetown Univ.,* 725 A.2d 472, 486 (D.C.1999), and a discretionary decision based on an "erroneous premise" cannot stand. *Killingham v. Wilshire Inv. Corp.,* 739 A.2d 804, 811 (D.C.1999). *See generally Johnson v. United States,* 398 A.2d 354 (D.C.1979). Therefore, we must at this point vacate the imposition of the sanction, without prejudice to a decision whether to impose an award following an exercise of discretion based on correct legal principles.[19]

In so holding, however, we do not intend to suggest that Breezevale is necessarily beyond the sanctioning power of the trial court on remand. We reject Breezevale's contention that the trial court lacks authority to sanction parties for illegal or unethical litigation tactics simply because their substantive claims have some merit. The language of *Synanon II, supra,* would make no sense unless one assumes that a party may have colorable claims but still engage in sanctionable bad faith litigation. *See Synanon II, supra,* 517 A.2d at 38 ("the conduct which would justify an award of bad faith attorneys' fees may be found either in the filing of a frivolous claim or in the manner in which a properly filed claim is subsequently litigated").

In fact, in *Synanon Foundation, Inc. v. Bernstein,* 503 A.2d 1254 (D.C.) (*Synanon I*), *cert. denied,* 479 U.S. 815, 107 S.Ct. 69, 93 L.Ed.2d 26 (1986), we specifically rejected the plaintiff's argument that its suit could not be dismissed for bad faith conduct during discovery until judgment was rendered, stating that the civil rules do not "subsume or abrogate" the trial court's "inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Id.* at 1264 (citation omitted). It would not only contradict our previous decisions but ignore reality to suggest that only parties who have no valid claims whatsoever abuse the judicial process. The trial court has the inherent authority to police itself against those who would abuse its processes, regardless of the substantive merits of their underlying claims.

For the foregoing reasons, the judgment as a matter of law entered in favor of GDC is reversed, except as it pertains to the Nigeria claim; the entry of judgment as a matter of law on the Nigeria claim is affirmed; the order concerning sanctions for bad faith litigation and unpaid legal fees is vacated; and the case is remanded for further consideration of the motion for a new trial and for further proceedings consistent with this opinion.

*So ordered.*

SCHWELB, Associate Judge, concurring:

I concur in the judgment of the court and join Judge Steadman's opinion. The jury apparently found that although plaintiff Breezevale, through its officers and employees, fabricated offer letters and related documents in an attempt to deceive

---

**19.** Thus, we need not specifically address Breezevale's arguments on appeal that both the imposition of a $1,000,000 punitive sanction and the award of unpaid legal fees were improper under the circumstances of this case. As to the propriety of punitive damages, see *Synanon II, supra,* 517 A.2d at 39; *Zanville v. Garza,* 561 A.2d 1000 (D.C.1989). As to the unpaid legal fees, that award is different from the sanctions in nature, but ultimately must be reversed for the same reason, *i.e.* because it is premised on the trial court's erroneous view of the merits.

the court and to defraud Firestone, the plaintiff would probably have prevailed at trial in its suit against Firestone notwithstanding the forgeries and associated false testimony. To be sure, the fabrication of evidence could logically have infected Breezevale's case against Firestone in its entirety,[1] and I agree with the trial judge that the plaintiff's chicanery would almost certainly have been exposed anyway even if Breezevale had found a way to postpone Ms. Paul's deposition. Nevertheless, GDC has not demonstrated that the award of damages to Breezevale was unreasonable, for the fabricated documents related solely to a single discrete part of the Firestone litigation, and the jury did not find them decisive even as to that part. Accordingly, although I agree with the trial judge's unfavorable assessment of Breezevale's conduct, I join Judge Steadman in concluding that Breezevale's case against GDC does not fail as a matter of law for lack of proof of the requisite causal link between GDC's negligence and Breezevale's damages. I write separately, however, to emphasize that nothing in the court's opinion should be read as countenancing the kind of litigation tactics revealed by this record, or as limiting the authority of the trial judge to sanction Breezevale's misconduct in conformity with correct legal principles.

"Our adversary system depends on a most jealous safeguarding of truth and candor." *Jones v. Clinton*, 36 F.Supp.2d 1118, 1131 (E.D.Ark.1999) (quoting *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 463 (4th Cir.1993)). Lying to the court, or engaging in related deceptive practices, is "serious business." *Medrano–Quiroz v. United States*, 705 A.2d 642, 653 (D.C. 1997). "We [have] join[ed] Justice Kennedy in his rejection of the notion that one who violates his testimonial oath is no worse than the student who claims the dog ate his homework." *Coumaris v. District of Columbia Alcoholic Bev. Control Bd.*, 660 A.2d 896, 901 (D.C.1995) (quoting *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 325–26, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994) (Kennedy, J., concurring)).

Unfortunately, deception in judicial proceedings is not as unusual as it ought to be. In the centuries that have elapsed since Adam took that first bite of the apple in the Garden of Eden, a great many people, some of them powerful and famous, have been found to have lied under oath or to have otherwise done their best to conceal the truth and to subvert judicial proceedings. "Judges, lawyers and experts on the court system worry that perjury is being committed with greater frequency and impunity than ever before." Mark Curriden, *The Lies Have It*, 81 A.B.A. J. 68 (1995); *see also* Lisa C. Harris, Note, *Perjury Defeats Justice*, 42 WAYNE L.REV. 1755 (1996). A cynical observer who has seen it all might conclude that this sort of thing "goes with the territory" and that judges should not get too excited about it. Indeed, in one matrimonial controversy, this court referred, either infelicitously or ironically, to "a tolerable amount of perjury." *Coles v. Coles*, 204 A.2d 330, 331–32 (D.C.1964). But when fabrication of evidence or similar fraud has been discovered and exposed, the consequences ought to be severe enough to inhibit repetition. This case presents an unusually tawdry example of fraudulent litigation practices, and the judge did not and does not lack the authority to do something about it.

---

1. It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's *falsehood* or *other fraud* in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the case's lack of truth and merit. *The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause.*

*Mills v. United States*, 599 A.2d 775, 783–84 (D.C.1991) (emphasis in original) (quoting II J. WIGMORE, EVIDENCE § 278, at 133 (Chadbourn ed.1979)).

Three years after having settled with Firestone for $100,000 (rather than for the $3,500,000 offered by that defendant before Ms. Paul disclosed the forgeries), Breezevale brought this suit against GDC. Breezevale continued to insist that Ms. Paul was lying and that the offer letters and spreadsheets were genuine. Breezevale executives so testified under oath, but neither the jury nor the judge believed them. On the verdict form, the jury was asked:

> Do you find that [GDC] has established that forgeries occurred and, if so, that one or more Breezevale executives participated in such forgeries?

The jury answered: "Yes." Subsequently, in awarding GDC sanctions against Breezevale, the trial judge wrote that he had

> focused on the evidence directly relevant to the core question presented by the case: Did Breezevale forge offer letters in February of 1991 and thereupon litigate in bad faith? The [c]ourt has no difficulty in concluding the evidence clearly and convincingly compels an affirmative answer to the question.

Joseph Abou Jaoude, with the knowledge of Charles Awit and approval of Habib Habib, undertook in February 1991 to boost Breezevale's case against Firestone by creating a false 1987 record of business activity on Firestone's behalf. Once the fraud was disclosed and Breezevale's case against Firestone destroyed, Breezevale executives, rather than accept the outcome, chose to sue their lawyers for legal malpractice, asserting the documents at issue were genuine, yet knowing them to be false.

It is difficult to envision a clearer case of bad faith litigation. Not only did Breezevale make Gibson Dunn lawyers unwitting accomplices in its attempted fraud on Firestone when it created the forged documents and delivered them for discovery, but it then sought to punish Gibson Dunn for [Breezevale's] own misconduct. The cost to Gibson Dunn has been enormous. The cost to this [c]ourt and to the citizens of the District of Columbia, although obviously not as great, is also considerable. While the city may not be able to recoup, Gibson Dunn can.

These findings by the judge find overwhelming support in the record,[2] and they must ultimately inform the court's exercise of discretion in the imposition of sanctions. I think it important to emphasize that, as the trial judge pointed out, the issue as to which Breezevale presented fabricated evidence was "the core question presented by the [malpractice] case." Even if we assume, in light of the jury's verdict, that Breezevale's action against GDC was "not in itself brought in bad faith," *see Synanon Found., Inc. v. Bernstein,* 517 A.2d 28, 38 (D.C.1986) (*Synanon II* ), it is significant that Breezevale's key allegation in the malpractice case was untrue and known by Breezevale to be untrue. The testimony offered in support of that allegation was likewise false. The final disposition of this case should reflect this underlying reality.[3]

---

**2.** In his 23–page opinion, the judge explicated, persuasively and in meticulous detail, why he, like the jury, credited Ms. Paul's account and disbelieved the denials by Breezevale's executives. I therefore believe that it is now unnecessary for the trial court to revisit this issue on remand. See maj. op., *ante,* at n. 17 (citing authority for partial new trials). To retry the question whether the documents were forged would be to add to these proceedings further costs which, as the judge noted with a measure of understatement, the District "may not be able to recoup."

**3.** As an alternative basis for affirmance, GDC seeks to invoke the principle that "[n]o court will lend its aid to a man who founds his cause of action on an immoral or illegal act." *Hunter v. Wheate,* 53 App. D.C. 206, 208, 289 F. 604, 606 (1923) (quoting *Higgins v.*

*McCrea*, 116 U.S. 671, 686, 6 S.Ct. 557, 29 L.Ed. 764 (1886) (quoting Lord Mansfield in *Holman v. Johnson*, 1 Cowper 341, 343, 98 Eng. Reports Reprint 1120, 1121)); *see also Horjales v. Loeb*, 291 So.2d 92, 93 (Fla.Dist. Ct.App.1974) ("One who engages in a fraudulent scheme loses all right to the prosecution of a lawsuit."). The doctrine of *Hunter* and like cases has been applied in actions for legal malpractice. *See, e.g., Carmel v. Clapp & Eisenberg, P.C.*, 960 F.2d 698, 704 (7th Cir. 1992) ("the appellant's own fraud may bar his legal malpractice claim in connection with transactions complained of"); *Mettes v. Quinn*, 89 Ill.App.3d 77, 44 Ill.Dec. 427, 411 N.E.2d 549, 551–52 (1980) (dismissing action against attorney who allegedly rendered negligent advice, where this advice led to setting aside of favorable settlement agreement which had been induced by client's misrepresentations). GDC's reliance on these authorities is not implausible, for the central allegation of Breezevale's malpractice suit has been found by both judge and jury to be false.

Having ruled in GDC's favor on other grounds, the trial judge did not reach the issue whether dismissal was appropriate on the grounds that Breezevale had founded its action on its own illegal or immoral conduct. Although this court is free to affirm a judgment on grounds not relied upon by the trial judge, *see, e.g., In re O.L.*, 584 A.2d 1230, 1232 n. 6 (D.C.1990), I do not believe that it would be appropriate to do so in this case. The jury found that Breezevale had some legitimate claims, and "the court must scrupulously avoid penalizing a party for a legitimate exercise of the right of access to the courts." *Synanon II, supra*, 517 A.2d at 37; *see also Lipsig v. National Student Mktg. Corp.*, 214 U.S.App.D.C. 1, 3–4, 663 F.2d 178, 180–81 (1980) (per curiam). The weighing of the relevant considerations would have required the trial judge to exercise his discretion, and in this case the judge has not yet had occasion to do so, so affirmance would be premature. Moreover, in general, the principle of *Hunter* has been applied in situations in which the plaintiff's recovery depended entirely on his fraudulent conduct, so that he could not recover without invoking the fruits of his own fraud. The jury's verdict in this case recognizes the validity of some of Breezevale's claims and thus suggests that dismissal on *Hunter* grounds would not be warranted.